# UNITED STATES DISTRICT COURT
# DISTRICT OF MAINE

MELISSA A. ADLE, as Personal Representative
of the Estate of Shad I. Gerken, late of
Woodville, County of Penobscot and State of
Maine,

                    Plaintiff,

v.

THE STATE OF MAINE, DEPARTMENT OF
PUBLIC SAFETY, MAINE STATE POLICE
DEPARTMENT, et al.

                    Defendants.

Civil Action No. 1:15-cv-00458-NT

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
## WITH INCORPORATED MEMORANDUM OF LAW

On the morning of September 27, 2014, Shad Gerken, apparently suffering from a serious and untreated mental illness, was spotted walking on a road shouting at passing cars while holding an 11-inch knife.  When he encountered an eight-year-old girl getting the mail, he threatened to kill her unless she stopped looking at him.  When confronted by a deputy sheriff and a game warden, he ran into the woods.  While giving chase, the game warden repeatedly pepper-sprayed Mr. Gerken and even tried to wrestle the knife away, sustaining cuts on his hand in the process.  A local police officer arrived and Tasered Mr. Gerken four times while the game warden continued to use the pepper spray.  None of these tactics worked.  A standoff ensued, with Mr. Gerken laying on the ground, holding the knife to his chest.

Defendant Maine State Police ("MSP") deployed its Crisis Negotiation Team and its Tactical Team to attempt to resolve the standoff.  Expert MSP negotiators spent hours trying to persuade Mr. Gerken to put down the knife while the Tactical Team provided security.  A

warrant was issued for Mr. Gerken's arrest.  As daylight began to fade, and with negotiations eliciting only a violent threat from Mr. Gerken, the Tactical Team commander, defendant Sgt. Nicolas Grass, decided to use a combination of non-lethal tactics to take Mr. Gerken into custody.  Unfortunately, the tactics did not subdue Mr. Gerken, and, after he advanced towards Tactical Team members with his knife, Sgt. Grass and the two other defendants, Sgt. Donald Shead and Det. Greg Mitchell, were forced to fire upon him, killing him.

The plaintiff claims that the three individual defendants are liable pursuant to 42 U.S.C. § 1983, the Maine Civil Rights Act, and at common law, for allegedly using excessive force in violation of the Fourth Amendment.  The plaintiff claims that the MSP is liable pursuant to three laws (the Americans With Disabilities Act, the Rehabilitation Act, and the Maine Human Rights Act) that prohibit discrimination on the basis of disability.  The undisputed facts demonstrate that defendants are entitled to summary judgment on all of these claims.

Defendants' use of non-deadly and then deadly force against Mr. Gerken was objectively reasonable and did not violate the Fourth Amendment.  The undisputed facts show that, faced with difficult circumstances, Sgt. Grass made a reasonable decision to try to take Mr. Gerken into custody rather than allow a dangerous standoff with an armed man who had made multiple violent threats continue into darkness.  The tactics he chose—a sustained burst of water from a firehose and a non-lethal impact munition called a baton round—employed a reasonable level of force to subdue a person subject to lawful arrest who was noncompliant, unpredictable, and armed with a deadly weapon.  And the three defendant officers resorted to deadly force only after Mr. Gerken advanced within 15 feet brandishing his knife—well within the range that a reasonable officer could perceive an imminent threat of serious bodily injury.

The plaintiff may argue that defendants' use of force was not so much excessive as it was ill-advised: that if the Tactical Team had given negotiations, say, ten hours instead of six, or had deployed Tasers and a police canine instead of a firehose and a baton round, the confrontation leading to Mr. Gerken's death might have been avoided.  Such after-the-fact speculation does not state a claim for excessive force; to the contrary, it employs exactly the sort of "20/20 vision of hindsight" that the U.S. Supreme Court has long rejected.  The burden on the plaintiff is not to show that a different approach might have worked better; it is to show that no reasonable officer on the scene could have chosen the tactics actually used.  The plaintiff cannot meet that burden.

In any event, even if there were a Fourth Amendment violation, the defendants would be entitled to qualified immunity because no clearly established law forbade the Tactical Team from attempting to take Mr. Gerken into custody, from using a firehose and a foam-baton launcher to do so, or from defending themselves with deadly force when Mr. Gerken advanced to within 15 feet of them with a knife.

The plaintiff's claims under the anti-discrimination laws fare no better.  Numerous courts have confirmed that these laws do not prevent police from protecting the public and themselves merely because a person's objectively dangerous behavior stems from a disability.  Moreover, although MSP officers in fact extensively accommodated Mr. Gerken's disability, they had no legal obligation to do in the exigent circumstances of a dangerous standoff.  The plaintiff's failure-to-train claim fails because there was no underlying act of discrimination against Mr. Gerken and because the undisputed facts show that the MSP officers on the scene had considerably more mental-illness training than First Circuit precedent requires.

Finally, if the Court exercises pendent jurisdiction, defendants are entitled to summary judgment on plaintiff's state law claims for the same reasons as the Fourth Amendment claim.

3

## MEMORANDUM OF LAW

### Summary of Undisputed Facts

*Events Prior to the Arrival of the Defendants*

At approximately 10:00 a.m. on September 27, 2014, the Penobscot County Sheriff's Office received a call that a man, later identified as Shad Gerken, was walking down Woodville Road in Chester, Maine, holding an 11-inch long knife and shouting at passing traffic. Stipulated Statement of Material Facts ("SSMF"), ¶¶ 1–2. Mr. Gerken encountered an eight-year-old girl retrieving mail from her grandparents' mailbox, and he threatened to kill her if she did not stop looking at him. *Id.* ¶ 3.

A deputy sheriff and a game warden arrived and ordered Mr. Gerken to drop his knife. *Id.* ¶¶ 4–5. Mr. Gerken did not comply and instead fled into the woods. *Id.* ¶ 5. The officers ran after Mr. Gerken. *Id.* ¶ 6. During the chase, the game warden repeatedly sprayed Mr. Gerken directly in the face with pepper spray, but the spray had no observable effect. *Id.* ¶ 7. At one point, the game warden attempted to wrest the knife away from Mr. Gerken, but the attempt was unsuccessful and the game warden sustained lacerations to his hand. *Id.* ¶ 8. Throughout the encounter, Mr. Gerken ignored repeated commands to drop his knife. *Id.* ¶ 9.

A local police officer arrived on the scene with a Taser. *Id.* ¶ 10. At that point, Mr. Gerken was lying on his back and still holding his knife. *Id.* ¶ 11. The officer deployed her Taser four times on Mr. Gerken, while, in between Taser deployments, the game warden sprayed Mr. Gerken with pepper spray. *Id.* ¶ 12. The repeated Taser and pepper spray deployments did not cause Mr. Gerken to relinquish control of his knife. *Id.* ¶ 12.

*Initial Maine State Police Response and Efforts to Communicate with Mr. Gerken*

Around 11 a.m., Corporal Jason Madore, the commander of the Maine State Police Crisis Negotiation Team ("CNT"), received a request to deploy crisis negotiators to the scene.  *Id.* ¶ 14.[1]  Sgt. Carleton Small, a CNT negotiator, arrived at the scene at approximately 12:15, and Cpl. Madore arrived a half-hour later.  *Id.* ¶¶ 18–19.  Cpl. Madore learned that the local sheriff's office was working with an Assistant District Attorney to obtain an arrest warrant for Mr. Gerken.  *Id.* ¶ 20.

Sgt. Small observed that officers had formed a perimeter around Mr. Gerken, who was lying on the ground holding the knife.  *Id.* ¶ 21.  MSP Trooper Thomas Fiske, who had some training in negotiation, *id.* ¶ 181, was attempting to communicate with Mr. Gerken.  *Id.* ¶ 21. Sgt. Small observed that Tpr. Fiske was talking in an appropriately calm voice to Mr. Gerken and was trying various approaches to establish a rapport with Mr. Gerken and persuade him to put down the knife.  Defendants' Statement of Undisputed Material Facts ("DSUMF") ¶ 190. Mr. Gerken was mostly silent and nonresponsive.  SSMF ¶ 22.

Meanwhile, Cpl. Madore gathered personal information about Mr. Gerken for use in negotiations.  *Id.* ¶ 23.  Cpl. Madore received information from a deputy sheriff who was familiar with Mr. Gerken and learned, among other things, that Mr. Gerken's wife and children had left him in July of that year because Mr. Gerken was having homicidal ideations towards her.  *Id.* ¶ 24.

---

[1] The Crisis Negotiation Team is comprised of MSP officers trained to respond to crisis incidents—events in which a person threatens to inflict, or has inflicted, serious bodily injury or death on him- or herself, another person, or both.  *Id.* ¶ 15.  Members of the Crisis Negotiation Team receive specialized training in negotiation and communication techniques for use in crisis incidents, including incidents involving individuals experiencing mental health crises and standoffs between law enforcement and armed and unarmed individuals.  *Id.* ¶ 16.

*The Tactical Team Responds While Negotiations Continue*

At 12:18 p.m., Sgt. Nicholas Grass, the commander of the Maine State Police Tactical Team (the "Tactical Team"), learned that the Penobscot County Sheriff's Office was requesting that the Tactical Team respond to the scene. *Id.* ¶¶ 29–30.[2]  Sgt. Grass arrived at the scene at 2:15 p.m. *Id.* ¶ 34.  The other responding Tactical Team members were Det. Greg Mitchell, Sgt. Donald Shead, Det. Todd Stetson, Sgt. Scott Dalton, Sgt. Peter Michaud, Sgt. Scott Hamilton, and Tpr. Gregory Roy. *Id.* ¶ 32.  The Tactical Team members were briefed on the situation, including the conduct of Mr. Gerken that had led to the standoff. *Id.* ¶¶ 29, 34, 36, 38; DSUMF, ¶¶ 192–94.

The Tactical Team members formed roughly a semi-circle perimeter around Mr. Gerken. SSMF ¶¶ 39–44.  They could not surround him because of the risk of crossfire. *Id.* ¶ 44.  Facing Mr. Gerken, Sgt. Grass and Sgt. Michaud were positioned on the left end of the semicircle and Sgt. Shead and Det. Mitchell were positioned on the right end of the semicircle. *Id.* ¶ 44.

At approximately 2:20 p.m., Mr. Gerken became agitated and yelled statements including: "You've got no ammo"; "I had 30 minutes of lightening. What are you going to do?"; and, "I am the angel of death and I can kill us all with one fingernail." *Id.* ¶ 50.  Sgt. Small and Cpl. Madore conferred, and determined Sgt. Small should take over for Trooper Fiske. *Id.* ¶ 51.[3]

---

[2] The Tactical Team  is a unit of the MSP specially trained and equipped to respond to high-risk incidents, such as incidents creating a threat to the general public or incidents in which there is a reasonable likelihood of a person's actions causing serious bodily injury or death. *Id.* ¶ 25.  As a matter of MSP policy and practice, in nearly every incident in which the Crisis Negotiation Team is activated to respond to a crisis incident in which there is a potential risk to law enforcement or the public, the Tactical Team is also activated to provide protection and tactical support. *Id.* ¶ 26.

[3] Sgt. Small is one of the most experienced negotiators on the Crisis Negotiation Team, having served as a negotiator since 1998. *Id.* ¶ 52.  As of September 27, 2014, Sgt. Small had responded as a member of the Crisis Negotiation Team to approximately 75 incidents and had served as primary negotiator in at least 25 incidents, most of which involved individuals who were emotionally disturbed. *Id.* ¶ 53.  Sgt. Small had received extensive training on interacting with individuals with mental illness, including a 40-hour FBI negotiation course in 1998 and a 40-hour course presented by the National Alliance for the Mentally Ill (NAMI) in 2013 focused exclusively on how to interact with individuals with mental illness. *Id.* ¶ 54.

Sgt. Small spoke to Mr. Gerken in a calm, soothing tone of voice throughout the entire negotiation.  DSUMF ¶ 195.  Sgt. Small spoke to Mr. Gerken extensively about Mr. Gerken's three children, whose names he had learned, assured Mr. Gerken that he wasn't going to approach him and the police would not hurt him, and offered to get him food, water, and medical attention if he would put down the knife.  SSMF ¶ 62.  Although Mr. Gerken was mostly nonresponsive, he, at least twice, answered "no" to Sgt. Small's requests to put down the knife. *Id.* ¶ 66.

At Sgt. Grass's request, Cpl. Madore positioned himself behind Sgt. Small and offered suggestions and relayed information about Mr. Gerken that had been gathered by another team member at the command post.  *Id.* ¶¶ 68, 75.  Among the information relayed was information from a doctor at Acadia Hospital in Bangor who had reviewed Mr. Gerken's mental health records.  *Id.* ¶ 79.  Sgt. Small used this information in negotiations.  *Id.* ¶ 81.

*Attempts at Negotiation Fail and Decision Made to Implement a Tactical Plan*

As the afternoon progressed, members of the Tactical Team found it increasingly difficult to clearly see Mr. Gerken.  *Id.* ¶ 140.  Sgt. Grass became concerned about the onset of darkness, which would interfere with the Tactical Team's ability to see Mr. Gerken and track him were he to escape the perimeter.  *Id.* ¶ 141.  At some point during the negotiations, Team members were informed that a warrant had issued for Mr. Gerken's arrest on criminal charges arising out his conduct prior to the standoff, including criminal threatening with a dangerous weapon and aggravated assault.  *Id.* ¶ 143.

Shortly after 5 p.m., Mr. Gerken began swiping the knife through the air and said "I'll cut you."  *Id.* ¶¶ 146–47, 149.  Cpl. Madore told Sgt. Grass that he did not believe further negotiations were likely to be successful.  *Id.* ¶ 152.  Based on this advice, as well as Mr.

7

Gerken's continued threatening behavior, and the risks posed by the deteriorating visibility, Sgt. Grass decided to take Mr. Gerken into custody.  *Id.* ¶ 154.

At approximately 5:15 p.m., Cpl. Madore took over for Sgt. Small, informed Mr. Gerken he was under arrest, and instructed him repeatedly how to submit to custody.  *Id.* ¶¶ 156, 160. Mr. Gerken did not comply.  *Id.* ¶¶ 159–160.

Sgt. Grass then ordered implementation of a tactical plan he had formulated during the negotiations.  *Id.* ¶ 162.  The plan involved having Tpr. Roy direct a blast of water from a firehose to pin Mr. Gerken to the ground and force the knife out of his hand.  *Id.* ¶ 88.[4]  In conjunction with the firehose, Sgt. Michaud, in his discretion, would fire a foam baton at Mr. Gerken to cause him to drop his knife.  *Id.* ¶ 96.[5]  Four Tactical Team members would "envelope" Mr. Gerken, converging on him from different directions to take him into custody. *Id.* ¶¶ 89–90.

Tpr. Roy activated the firehose and directed the stream at Mr. Gerken.  *Id.* ¶ 162.  Det. Mitchell and Sgt. Shead began advancing toward Mr. Gerken from the right end of the perimeter and Sgt. Grass and Sgt. Michaud began advancing toward Mr. Gerken from the left end.  *Id.* ¶¶ 164–65.  The stream of water did not pin Mr. Gerken to the ground or dislodge the knife from his hand.  *Id.* ¶ 166.  Mr. Gerken instead got to his feet, moved backwards, and stumbled into a fallen tree.  *Id.* ¶ 167; DSUMF ¶ 207.  Around this time, Sgt. Michaud deployed the foam baton, which did not cause Mr. Gerken to drop the knife.  DSUMF ¶ 208.

---

[4] At the request of Sgt. Grass, the Lincoln Fire Department had brought a firetruck to the scene.  *Id.* ¶¶ 85–86.  The firefighters had prepared the hose after having been advised that it was to be used to pin Mr. Gerken to the ground. *Id.* ¶¶ 132–137.

[5] A foam-baton launcher fires a foam projectile that can cause pain and distract someone without causing serious injury.  *Id.* ¶ 91.  It is considered to be a non-lethal impact munition and had been approved by the Maine Criminal Justice Academy Board of Trustees.  *Id.* ¶ 92.

Mr. Gerken then changed direction, moving towards Sgt. Shead and Det. Mitchell while holding the knife up and gripping it like an ice pick. *Id.* ¶¶ 209–210. Sgt. Shead saw Mr. Gerken turn aggressively toward Det. Mitchell, who was about 15 feet from Mr. Gerken. *Id.* ¶¶ 212–13. Mr. Gerken was holding the knife over his head in a menacing manner, with the tip of the blade pointed downwards and the blade facing out. *Id.* ¶ 214. Based on his perception that Mr. Gerken at that moment posed an imminent threat of serious bodily injury to Det. Mitchell and himself, Sgt. Shead fired several shots at Mr. Gerken. *Id.* ¶ 215. Mr. Gerken fell to the ground, rolled, and started to get back up while still holding the knife. *Id.* ¶ 216. At that point, Mr. Gerken was only 10 to 13 feet from Sgt. Grass and no more than 10 feet from Det. Mitchell. *Id.* ¶¶ 218–19. Det. Mitchell shouted at Mr. Gerken repeatedly to stop moving and stay on the ground. *Id.* ¶ 220. Mr. Gerken disregarded Det. Mitchell's commands. *Id.* ¶ 221. Perceiving that Mr. Gerken continued to pose an imminent threat of stabbing a Tactical Team member, Sgt. Grass, Det. Mitchell, and Sgt. Shead fired additional rounds at Mr. Gerken until they perceived that Mr. Gerken was incapacitated. *Id.* ¶¶ 222–26.

Sgt. Shead, one of the Tactical Team's medics, then approached Mr. Gerken to provide first aid if necessary. *Id.* ¶ 227. Sgt. Shead had to remove the knife from Mr. Gerken's hand in order to access his neck to take his pulse. *Id.* ¶¶ 228–29. It was determined that Mr. Gerken was deceased. *Id.* ¶ 230.

### Summary Judgment Standard

"Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Cortes-Rivera v. Dep't of Corr. & Rehab. of Com. of Puerto Rico*, 626 F.3d 21, 26 (1st Cir. 2010). "The nonmovant may defeat a summary judgment motion by demonstrating, through submissions of evidentiary quality, that a

trialworthy issue persists." *Iverson v. City Of Boston*, 452 F.3d 94, 98 (1st Cir. 2006).  But, a

nonmovant "cannot rely on speculation to avoid summary judgment." *Medina-Rivera v. MVM,*

*Inc.*, 713 F.3d 132, 136 (1st Cir. 2013); *see also Ahern v. Shinseki*, 629 F.3d 49, 58 (1st Cir.

2010) ("Conclusions that rest wholly on speculation are insufficient to defeat a motion for

summary judgment.").

## Argument

### I.  The Three Individual Defendants Are Entitled to Qualified Immunity on Plaintiff's Section 1983 Claim.

In Count II,[6] the plaintiff asserts a claim under 42 U.S.C. § 1983 against Sgt. Grass, Det.

Mitchell, and Sgt. Shead, alleging that they used excessive force against Mr. Gerken in violation

of the Fourth Amendment.[7]  Am. Compl. ¶¶ 30–39.  Qualified immunity is a defense against

Section 1983 claims.  "The doctrine of qualified immunity protects government officials 'from

liability for civil damages insofar as their conduct does not violate clearly established statutory or

constitutional rights of which a reasonable person would have known.'"  *Pearson v. Callahan*,

555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

"[Q]ualified immunity protects 'all but the plainly incompetent or those who knowingly violate

the law.'" *MacDonald v. Town of Eastham*, 745 F.3d 8, 11 (1st Cir. 2014) (quoting *Malley v.*

*Briggs*, 475 U.S. 335, 341 (1986)).  The First Circuit has set forth the process for determining the

applicability of qualified immunity:

---

[6] The moving defendants are not named in Count I, and the defendants who are named in that count have been
dismissed.  *See* Docket Item 23.

[7] Section 1983 states that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage
. . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights,
privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at
law . . . ."  42 U.S.C. § 1983.

   The Fourth Amendment gives citizens the right to be free from "unreasonable searches and seizures."  U.S. Const.
Amend. IV.

A two-part framework governs whether a defendant is entitled to qualified immunity. First, we inquire whether the facts, taken most favorably to the party opposing summary judgment, make out a constitutional violation. Second, we inquire whether the violated right was clearly established at the time that the offending conduct occurred. The second, "clearly established," step itself encompasses two questions: whether the contours of the right, in general, were sufficiently clear, and whether, under the specific facts of the case, a reasonable defendant would have understood that he was violating the right.

*Ford v. Bender*, 768 F.3d 15, 23 (1st Cir. 2014) (citations omitted); *see also Walden v. City of Providence*, 596 F.3d 38, 52 (1st Cir. 2010); *Maldonado v. Fontanes*, 568 F.3d 263, 269 (1st Cir. 2009). "It is important to emphasize that [the clearly established] inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). A defendant has not violated a clearly established right "unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014). "In other words, 'existing precedent must have placed the statutory or constitutional question' confronted by the official 'beyond debate.'" *Id.* (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). In the summary judgment context, the "ultimate inquiry becomes whether a reasonable factfinder could conclude that the defendants' conduct was 'so deficient that no reasonable officer could have made the same choices under the circumstances.'" *Estate of Bennett v. Wainwright*, 548 F.3d 155, 168 (1st Cir. 2008) (quoting *Napier v. Town of Windham*, 187 F.3d 177, 184 (1st Cir. 1999)); *see also Saucier*, 533 U.S. at 202 ("The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.").

### A.  The Undisputed Facts Demonstrate that Defendants Did Not Violate the Fourth Amendment.[8]

#### 1.  Applicable Fourth Amendment Standards

Plaintiff alleges that the defendants used excessive force against Mr. Gerken when they (1) discharged a firehose and a foam baton round at Mr. Gerken; and (2) fatally shot Mr. Gerken after he advanced toward law enforcement officers while brandishing a knife in a threatening manner.  *See* Am. Compl. ¶¶ 33, 37.  Where, as here, an excessive force claim arises in the context of an arrest, "it is most properly characterized" as one invoking the Fourth Amendment's protections against unreasonable seizures of the person.  *Graham*, 490 U.S. at 394.

It is well-settled that "the right to make an arrest . . . carries with it the right to use some degree of physical coercion or threat thereof to effect it."  *Id.* at 396; *accord Fernandez-Salicrup v. Figueroa-Sancha*, 790 F.3d 312, 326 (1st Cir. 2015).  Here, defendants undisputedly had a warrant for Mr. Gerken's arrest, SSMF ¶ 143, and thus had the right to use some level of force to arrest Mr. Gerken if he declined to surrender voluntarily.  To prevail, then, the plaintiff must show that the "level of force was objectively unreasonable under the circumstances."  *Fernandez-Salicrup*, 790 F.3d at 326; *see also Brosseau*, 543 U.S. at 197 ("claims of excessive force are to be judged under the Fourth Amendment's 'objective reasonableness' standard"); *Jennings v. Jones*, 499 F.3d 2, 11 (1st Cir. 2007).  The test is an objective one: "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."  *Graham*, 490 U.S. at 397.

---

[8] "Federal courts have discretion to bypass the first step of the qualified immunity framework and to focus instead on the second step."  *Ford*, 768 F.3d at 23; *see also Pearson*, 555 U.S. at 236.  Skipping to the second step is worthwhile "where the constitutional questions presented are heavily fact-bound, minimizing their precedential value."  *Maldonado*, 568 F.3d at 270; *see also Pearson*, 555 U.S. at 237 ("For one thing, there are cases in which the constitutional question is so factbound that the decision provides little guidance for future cases.").  The present case is heavily fact-bound, and the Court may find it appropriate to skip the first step and proceed directly to considering whether defendants should reasonably have understood that their actions violated the Fourth Amendment.

In determining whether the force used to effect an arrest was reasonable, relevant factors include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396.  Reasonableness "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.*  The calculus should recognize that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97.

### 2.  *Use of the Firehose and Foam-Baton Launcher*

Plaintiff claims that Sgt. Grass used excessive force against Mr. Gerken when he ordered members of the Tactical Team to discharge a firehose and fire a foam baton at Mr. Gerken. Amended Complaint ¶ 33.[9]  Under the circumstances, Sgt. Grass acted reasonably.  Sgt. Grass was aware that an arrest warrant had been issued for Mr. Gerken for serious offenses— aggravated assault and criminal threatening with a dangerous weapon.  SSMF ¶ 143.  This necessarily authorized Sgt. Grass to use at least some level of force to secure Mr. Gerken's arrest. *Graham*, 490 U.S. at 396.  Sgt. Grass was aware that Mr. Gerken was armed with a knife and he understood that Mr. Gerken had earlier used it to slash or cut a game warden.  DSUMF ¶ 192.  He was aware that Mr. Gerken had threatened to kill a young girl, and he had personally witnessed Mr. Gerken threaten law enforcement officers.  SSMF ¶¶ 29, 147.  He was aware that repeated deployments of a Taser and pepper spray earlier in the day had not been effective and, in any event, neither Tasers nor pepper spray had sufficient range to be used at a reasonably safe distance from Mr. Gerken.  *Id.* ¶¶ 29, 102–03.  The commander of the Crisis Negotiation Team

---

[9] Plaintiff has not alleged that Det. Mitchell or Sgt. Shead bear any responsibility for use of the firehose and foam-baton launcher.

had advised him, after more than six hours of fruitless negotiation attempts, that further negotiation would not likely succeed.  *Id.* ¶ 152.  Daylight was fading, increasing the risk to the Tactical Team as well as the risk that Mr. Gerken could escape and threaten the public.  *Id.* ¶¶ 140–42, 154.

Given these dangerous circumstances, the non-lethal tactics chosen by Sgt. Grass to take Mr. Gerken into custody were reasonable.  Sgt. Grass decided to use the firehose after attending a presentation by a police expert regarding the use of firehoses to subdue dangerous individuals. *Id.* ¶ 113.  Plaintiff's own expert endorsed the use of firehoses:  "The use of the fire hose is an excellent tactic, when applied properly.  A full-force use of the water pressure will keep a man from maintaining his feet, if standing and will force a subject on the ground to stay down.  This allows for the officers to move into position to disarm the subject."  *Id.* ¶ 114.

Sgt. Grass had a Team member on scene, Tpr. Roy, who he knew had recently received instruction in the use of a firehose and had successfully used a firehose against a barricaded suspect.  *Id.* ¶¶ 115–16.  Trooper Roy met with firefighters to confirm that the hose was properly set up to pin a man to the ground and to obtain instruction in its use.  *Id.* ¶¶ 134–38.  Trooper Roy's diligent actions confirm that Sgt. Grass acted reasonably in delegating to him the task of operating the firehose.  In short, there was no reason for Sgt. Grass to have anticipated that the firehose would not work as planned.

The decision to authorize the use of the foam-baton launcher in conjunction with the firehose as a means of disarming Mr. Gerken was also reasonable.  The MSP has expressly authorized the use of foam-baton launchers and other "impact munitions" because they have "saved the lives of many police officers, innocent civilians, and suspects."[10]  DSUMF ¶ 236.

---

[10] Under the policy, impact munitions may be used by a properly trained officer whenever "a less-lethal diversion or tool would facilitate entry, enable arrest, and potentially reduce the risk of injury to the officer of another person."

Sgt. Grass knew that the operator of the launcher, Sgt. Michaud, was not just trained in its use, but was the Tactical Team's instructor on such devices.  SSMF ¶ 93.  Given Mr. Gerken's demonstrated resistance to other non-lethal tactics, it was reasonable for Sgt. Grass to authorize multiple non-lethal tactics in order to maximize the chances that one would be successful in disarming or incapacitating Mr. Gerken.

### 3.  Fatal Shooting of Mr. Gerken

Plaintiff claims that Sgt. Grass, Det. Mitchell, and Sgt. Shead used excessive force by fatally shooting Mr. Gerken.  "In the Fourth Amendment context, the use of deadly force is not excessive if an objectively reasonable officer in the same circumstances would have believed that an individual 'posed a threat of serious physical harm either to the officer or others.'"  *Estate of Bennett*, 548 F.3d at 175 (quoting *Young v. City of Providence ex rel. Napolitano*, 404 F.3d 4, 23 (1st Cir. 2005)).  Here, after the firehose was activated, Mr. Gerken got to his feet, and, after first stumbling backward, started moving toward Sgt. Shead and Det. Mitchell while holding the knife with the blade pointed out.  DSUMF ¶¶ 207–214.  When Mr. Gerken got within 15 feet of Sgt. Shead and Det. Mitchell, he turned aggressively toward Det. Mitchell.  *Id.* ¶¶ 212–13.  Perceiving Mr. Gerken to pose an imminent threat of serious bodily injury to Det. Mitchell and himself, Sgt. Shead fired at Mr. Gerken.  *Id.* ¶ 215.  Although Mr. Gerken fell to the ground, he rolled and started to get back up while still holding the knife, ignoring Det. Mitchell's commands to stay on the ground.  *Id.* ¶¶ 216–221.  All three defendants perceived Mr. Gerken to pose an imminent threat to cause serious bodily injury as he was getting to his feet with the knife in hand less than 15 feet away from members of the Tactical Team.  *Id.* ¶¶ 218–19, 222–25.  Cpl. Madore, a nondefendant, also saw Mr. Gerken getting to his feet and preparing to attack Sgt.

---

DSUMF ¶ 237.  Under state law, a law enforcement officer's use of a foam-baton launcher is considered the use of nondeadly force.  17-A M.R.S. § 101(5)(B).

Grass, and he perceived that Sgt. Grass was at imminent risk of serious bodily injury.  *Id.* ¶ 224.

Accordingly, Sgt. Grass, Det. Mitchell, and Sgt. Shead each fired additional rounds at Mr.

Gerken until they perceived that he was incapacitated.  *Id.* ¶ 226.  Given these circumstances, the

officers acted reasonably.  *See Estate of Bennett*, 548 F.3d at 176 ("An objectively reasonable

officer in their situation could have felt at risk of serious bodily harm and believed deadly force

to be necessary and lawful, and that is sufficient to legitimize the officers' use of deadly force.");

*Norton v. City of S. Portland*, 831 F. Supp. 2d 340, 363–64 (D. Me. 2011) (officer justified in

shooting suspect armed with knives who approached within fifteen to twenty-one feet of another

officer).

### B.  Defendants Did Not Violate a Clearly Established Right.

Even if an officer uses an unreasonable amount of force, qualified immunity will protect

the officer so long as his mistake was reasonable.  *Saucier*, 533 U.S. at 206.  If the Court were to

conclude that defendants used excessive force, they are nonetheless entitled to qualified

immunity because they could not reasonably have understood that, under the circumstances, their

conduct was unlawful.  *See id.* at 202.  Plaintiff bears the burden of "demonstrating the law was

clearly established at the time of the alleged constitutional violation."  *McGrath v. Tavares*, 757

F.3d 20, 29 (1st Cir. 2014), *cert. denied*, 135 S. Ct. 1183 (2015).  This is an "exacting standard"

and a "heavy burden indeed" for the plaintiff.  *Mitchell v. Miller*, 790 F.3d 73, 77 (1st Cir. 2015).

To show that the contours of a right were sufficiently clear to put an officer on notice that he was

violating the right, a plaintiff need not identify "a case directly on point, but existing precedent

must have placed the statutory or constitutional question beyond debate."  *al-Kidd*, 563 U.S. at

741.  "The dispositive question is 'whether the violative nature of <u>particular</u> conduct is clearly

established.'"  *Marrero-Mendez v. Calixto-Rodriguez*, No. 14-2030, 2016 WL 3902635, at *4

(1st Cir. July 19, 2016) (quoting *al-Kidd*, 563 U.S. at 742) (emphasis in original).  The plaintiff

must identify either "controlling authority" or "a robust 'consensus of cases of persuasive

authority.'"  *al-Kidd*, 563 U.S. at 742 (quoting *Wilson v. Layne*, 526 U.S. 603, 617 (1999)); *see*

*also Walden*, 596 F.3d at 53.

Defendants are aware of no authority—controlling or otherwise—that could have put

defendants on notice that their conduct was unlawful.

### 1.  Use of Firehose and Foam-Baton Round

In order to defeat qualified immunity on the Tactical Team's use of non-lethal force to

take Mr. Gerken into custody, the plaintiff must show that existing precedent as of September

2014 would have given Sgt. Grass fair notice either that the decision to take Mr. Gerken into

custody after hours of fruitless attempts to negotiate was unconstitutional or that the specific

tactics chosen to take him into custody were unconstitutional.  Even assuming that such

principles could be found in the Fourth Amendment—and they cannot—Sgt. Grass certainly did

not have fair notice of them.

As already noted, *Graham v. Connor* specifically holds that the police are entitled to use

a reasonable level of force to affect a lawful arrest.  Sgt. Grass was aware of Mr. Gerken's

unlawful and dangerous conduct that day and was further aware that a warrant had been issued

for his arrest.  SSMF ¶¶ 29, 143; DSUMF ¶ 192.  Not only did Sgt. Grass have no notice that

acting to arrest Mr. Gerken under these circumstances might be unconstitutional, under *Graham*

he had every reason to believe that he was legally entitled to act.  Indeed, in addition to the arrest

warrant, Sgt. Grass had three specific reasons for acting when he did: (1) it was getting dark, (2)

Mr. Gerken had just made a threat against the officers, and (3) the crisis negotiators had

concluded that negotiations were unlikely to succeed.  DSUMF ¶ 154.  As the Seventh Circuit

has explained in the context of a similar encounter, where a reasonable officer could see a need

to act, *Graham* does not permit an inquiry into whether it might have been better to wait:

> It is easy in retrospect to say that officers should have waited, or should have
> used some other maneuver—these propositions cannot be falsified—but
> *Graham* makes it clear that the fourth amendment does not require second-
> guessing if a reasonable officer making decisions under the uncertainty and
> press of time would have perceived the need to act.

*Bell v. Irwin*, 321 F.3d 637, 640 (7th Cir. 2003).  In this case, Sgt. Grass had objective reasons

for acting when he did.  There is no caselaw even suggesting—let alone placing it "beyond

debate"—that many hours of unsuccessful negotiation attempts coupled with increasing risk to

officers and the public is not enough to justify action.

Nor is it "beyond debate" that the specific tactics chosen by defendants were

unconstitutional.  A recent decision of the U.S. Supreme Court makes clear that a plaintiff cannot

pierce qualified immunity merely by claiming that the police used questionable tactics in the

course of applying an otherwise reasonable level of force.  In *Mullenex v. Luna*, 136 S. Ct. 305

(2015) (per curiam), the Supreme Court considered whether a police officer had qualified

immunity for trying to end a car chase by shooting from an overpass at the car's engine as it sped

under him.  The officer missed the engine but hit the driver four times, killing him.  *Id.* at 307.

The Court found that immunity applied even though (1) the officer had never been trained in the

engine-shooting tactic, had never seen it used, and had been specifically ordered not to attempt it

at that time, and (2) the police had already set up tire spikes—an alternative tactic for ending a

car chase in which the police were trained—just past the defendant's position.  *Id.* at 306–12.

The Court noted that it had never denied qualified immunity "because officers entitled to

terminate a high-speed chase selected one dangerous alternative over another."  *Id.* at 310.

Under *Mullenex*, the plaintiff cannot argue that Sgt. Grass should have tried alternative

tactics of comparable force; she must point to caselaw that would have put Sgt. Grass on notice

that tactics he chose used too much force for the circumstances. Defendants are aware of no cases whatsoever addressing the use of high-pressure water to incapacitate a suspect. Defendants are aware of no cases of controlling authority addressing the use of foam-baton launchers. Outside of the First Circuit, there are cases addressing the use of impact munitions, but these cases are heavily fact-dependent and there is no consensus suggesting that the use of a foam-baton in these circumstances was unlawful. *Compare Connors v. Froese*, No. 3:CV-07-0097, 2008 WL 423501, at *6 (M.D. Pa. Feb. 14, 2008) (firing of five bean bag rounds to disarm suspect wielding three knives was reasonable) *with Deorle v. Rutherford*, 272 F.3d 1272, 1285 (9th Cir. 2001) (shooting unarmed man in the face without warning with a bean bag round was excessive use of force).

In a case bearing some factual similarities to this one, a court found that officers acted reasonably in firing foam-baton rounds. *See Estate of Devine v. Fusaro*, No. 3:14-CV-01019, 2016 WL 183472 (D. Conn. Jan. 14, 2016). There, police located a potentially suicidal man, Timothy Devine, armed with a gun, on some rocks along the Long Island Sound. *Id.* at *2. After 5 ½ hours of negotiations were unsuccessful, police used flash grenades and fired several foam baton rounds at Mr. Devine. *Id.* at *3. The baton rounds did not cause Mr. Devine to drop his gun, and he instead held the gun to his head and said that the police were going to force him to kill himself. *Id.* Several minutes later, police fired six to eight more baton rounds at Mr. Devine, and he then fatally shot himself. *Id.* The court held that three important facts demonstrated that the officers acted reasonably and were entitled to qualified immunity from an excessive use of force claim:

> First, the police used a type of force that is designed to be less-than-lethal, rather than using deadly force. The degree of force is plainly relevant to its reasonableness. Second, the police used less-than-lethal force against a man whom they reasonably believed to be suicidal and to be armed with, and holding,

> a loaded gun while occupying public property. The presence of a dangerous
> weapon by an unstable person on public property is plainly of legitimate concern
> to law enforcement officers. Third, the police used less-than-lethal force after the
> passage of several hours of a stand-off and negotiations that had yet to succeed in
> convincing Devine to surrender his gun. The passage of time to allow
> consideration and resort to non-force alternatives is plainly significant to
> assessing the reasonableness of a later use of force by the police.

*Id.* at *6.  In response to the suggestion that the officers should have negotiated longer, the court

recognized that "[t]he Constitution does not compel the police to wait indefinitely and at the

mercy of a troubled and unstable mind." *Id.*

The court noted that it was "debatable" whether the police "acted wisely" when deciding

to use foam batons, especially since (1) there was no "immediate urgency that required the

officers to break off negotiations and to deploy any force at all;" (2) Mr. Devine had not

threatened to shoot officers and there was "no threat to innocent civilians or passersby;" (3)

police had been warned that batons would not work and police fired a second volley of batons

even after Mr. Devine "warned the officers to stop or that he would take his life." *Id.*

Nevertheless, the court recognized that its "role is not to decide if the officers chose wisely but to

decide if they chose unconstitutionally," and that "a plaintiff 'cannot establish a Fourth

Amendment violation based merely on bad tactics that result in a deadly confrontation that could

have been avoided.'" *Id.* at *7 (quoting *City & County of San Francisco v. Sheehan*, 135 S. Ct.

1765, 1776 (2015)).  Defendants here are at least as entitled to qualified immunity as were the

defendants in *Devine*.

### 2.  Fatal Shooting

Defendants are aware of no cases that would have put defendants on notice that it was

unlawful to shoot Mr. Gerken when, after having threatened to cut officers, he approached within

15 feet of members of the Tactical Team brandishing a knife in a menacing manner.  Indeed, in

the decision from this District most directly on point, the Court held that an officer's use of deadly force was justified. *Norton*, 831 F. Supp. 2d at 363–64. In *Norton*, an officer shot a suspect when the suspect, armed with knives and having previously threatened violence, approached within 15 to 21 feet of another officer. The court concluded that the officer's "use of deadly force under the circumstances appears objectively reasonable and, at the very least, is entitled to qualified immunity." *Id.* at 364. The same is true here.

The fact that Mr. Gerken was shot multiple times does not mean that the defendants acted unreasonably. In *Berube v. Conley*, 506 F.3d 79 (1st Cir. 2007), the court rejected the argument that an officer acted unreasonably because she continued to fire as the suspect fell to, or lay on, the ground:

> "[I]t is clear from the very brief time that elapsed that [the officer] made a split-second judgment in responding to an imminent threat and fired a fusillade in an emergency situation. [The officer's] actions cannot be found unreasonable because she may have failed to perfectly calibrate the amount of force required to protect herself.

*Id.* at 85; *see also Estate of Bennett*, 548 F.3d at 175 (fact that officer fired multiple shots and might even have reloaded his weapon did not matter because "in the context of this tense and dangerous situation, [the officer] could have reasonably believed that [the suspect] posed a continuing threat, and that his own safety and the safety of the other officers required him to keep firing"). Here, Sgt. Shead's initial shots did not incapacitate Mr. Gerken, and he continued to pose a threat when he started to get to his feet still holding the knife, and apparently intending to attack Sgt. Grass, who was only 10 to 13 feet away. DSUMF ¶¶ 215–224. All three defendants then reasonably reacted by firing additional rounds until Mr. Gerken no longer posed a threat.[11]

---

[11] In *Norton*, 831 F. Supp. 2d at 363, the Court suggested that the fact that more than one officer concluded that deadly force was justified is evidence that the conclusion was reasonable.

## II. *The MSP Did Not Discriminate Against Mr. Gerken on the Basis of Disability.*

The plaintiff contends that the MSP's officers discriminated against Mr. Gerken on the basis of disability in violation of the Americans with Disabilities Act (ADA), Rehabilitation Act, and Maine Human Rights Act, and that the MSP is liable for that alleged discrimination.[12]  To establish a violation under the ADA, the plaintiff must demonstrate that (1) Mr. Gerken was a "qualified individual" with a disability; (2) the MSP is subject to the ADA; and, (3) Mr. Gerken was denied the opportunity to participate in or benefit from the MSP's services, programs, or activities, or was otherwise discriminated against by the MSP by reason of his disability.[13] *Buchanan ex rel. Estate of Buchanan v. Maine*, 417 F. Supp. 2d 45, 72 (D. Me.), *aff'd sub nom. Buchanan v. Maine*, 469 F.3d 158 (1st Cir. 2006).  The test for the other two statutes is effectively the same.  *See Crocker v. Lewiston Police Dep't*, No. 00-13-PC, 2001 WL 114977, at *6 (D. Me. Feb. 9, 2001).

The plaintiff makes two claims of discrimination: that the MSP misperceived lawful behavior by Mr. Gerken as criminal, and that the MSP failed to reasonably accommodate Mr. Gerken's disability in the course of attempting to arrest him.  Neither of these claims is viable in the context of a police standoff with an armed and violent individual.

### A. *The MSP Did Not Attempt to Take Mr. Gerken into Custody Based on a Misperception of His Conduct.*

The first type of disability discrimination claim that can arise from an arrest is a claim that "police wrongly arrested someone with a disability because they misperceived the effects of that disability as criminal activity."  *Buchanan*, 417 F. Supp. 2d at 72 (quoting *Vincent v. Town*

---

[12] The MSP contends that it has sovereign immunity from plaintiff's ADA claim, but it is not arguing the issue on summary judgment because the Rehabilitation Act and Maine Human Right Act claims are, for the most part, coextensive.  Recoverable damages, though, may differ among the acts.  In the event that plaintiff's ADA claim survives summary judgment, the issue of whether the MSP is immune from the ADA claim may become relevant.

[13]  The MSP concedes the first two elements for purposes of summary judgment.

*of Scarborough*, No. CIV. 02-239-PH, 2003 WL 22757940 (D. Me. Nov. 20, 2003), *report and recommendation adopted,* No. CIV. 02-239-P-H, 2003 WL 23004993 (D. Me. Dec. 19, 2003)). Examples of this type of discrimination include arresting a person for drunk driving after wrongfully misperceiving symptoms of stroke as intoxication, *see id.* (citing *Jackson v. Inhabitants of Town of Sanford*, No. CIV. 94-12-P-H, 1994 WL 589617 (D. Me. Sept. 23, 1994)), or arresting a deaf person for resisting arrest when he failed to respond to police commands he could not hear, *see Lewis v. Truitt*, 960 F. Supp. 175, 178–79 (S.D. Ind. 1997).  To prevail on such a claim, the plaintiff must show that the MSP misperceived lawful conduct caused by Mr. Gerken's disability as criminal activity, and then arrested him for that conduct.  *See Gohier v. Enright*, 186 F.3d 1216, 1222 (10th Cir. 1999).

It is not enough that police took action against a suspect based on conduct related to the suspect's disability; police must also misperceive the disability-related conduct as justifying a police action when, in fact, it did not.  *See Buchanan*, 417 F. Supp. 2d at 73.  Thus, for example, where a police officer shot an individual who attacked him due to his mental illness, the Tenth Circuit ruled that the unlawfulness of the conduct defeated any misperception claim, even if the individual would not have been criminally responsible for his actions.  *Gohier*, 186 F.3d at 1222. Similarly, where a mentally unstable individual was carrying a rifle in a crowded shopping plaza, this Court rejected the notion that police might have trained their guns on the individual due to misperceptions about his disability, as opposed to their accurate perception that he posed a risk to the public.  *Vincent*, 2003 WL 22757940, at *24.

Here, MSP's officers did not act based on misperceptions of any sort.  They were well aware that Mr. Gerken was mentally ill; indeed, they took steps to learn as much as they could about his illness.  SSMF ¶¶ 24, 78–80; DSUMF ¶ 192.  However, they also knew that Mr.

Gerken was dangerous.  They knew that he had threatened to kill a young girl earlier that day. SSMF ¶ 29; DSUMF ¶ 194.  They understood that he cut a game warden with his knife, and that he had refused to drop the knife despite being Tasered and pepper sprayed and despite hours of attempts at communication, including by a crisis negotiator.  SSMF ¶ 29; DSUMF ¶¶ 192–94. They knew he had, during the negotiations, waved the knife and threated to "cut" law enforcement on the scene.  SSMF ¶¶ 146–49.  They also knew that a warrant had issued for Mr. Gerken's arrest on felony charges.  *Id.* ¶ 143.  Like the police in *Vincent*, the police here acted not because they misunderstood Mr. Gerken's disability, but because they correctly understood that Mr. Gerken posed a risk to themselves and the public.[14]

The plaintiff may argue that Mr. Gerken's illness was so severe that he could not have formed a culpable mental state, making discriminatory any perception by the police that Mr. Gerken engaged in criminal conduct.  There are several things wrong with this contention.

First, regardless of whether Mr. Gerken could in fact form criminal intent, police on the scene had probable cause to believe he had committed crimes, which is all that is necessary to defeat an ADA wrongful arrest claim.  *See Bates*, 216 F.3d at 373; *J.H. ex rel. J.P. v. Bernalillo Cty.*, No. CIV 12-0128, 2014 WL 3421037, at *101 (D.N.M. July 8, 2014), *aff'd,* 806 F.3d 1255 (10th Cir. 2015); *Patrice v. Murphy*, 43 F. Supp. 2d 1156, 1161 (W.D. Wash. 1999); *see also Sperry v. Maes*, No. 10-CV-03171-RPM, 2013 WL 3465784, at *5–6 (D. Colo. July 10, 2013), *aff'd,* 592 F. App'x 688 (10th Cir. 2014) ("the question is not whether the police were ultimately correct in assessing the legality of the plaintiff's conduct, but whether the assessment was

---

[14]  *See also Bates ex rel. Johns v. Chesterfield Cty.*, 216 F.3d 367, 373 (4th Cir. 2000) (no ADA violation where officers' use of force and arrest was because of autistic man's "objectively verifiable misconduct," rather than his disability); *Thompson v. Williamson* , 219 F.3d 555, 558 (6th Cir. 2000) (ADA claim fails where individual was denied access to mental services because of his "violent, threatening behavior, not because he was mentally disabled").

reasonable").  Mr. Gerken's threat to kill the young girl if she continued to look at him, SSMF ¶ 3, was goal oriented (i.e., he wished the girl to stop looking at him), and thus indicative of intentional conduct.  *See State v. Graham*, 2015 ME 35, ¶ 29, 113 A.3d 1102.  Morever, during the standoff, Mr. Gerken gave multiple indications that he understood what the negotiators were saying to him.  SSMF ¶¶ 66–67, 159.

Second, the MSP acted to take Mr. Gerken into custody only after they learned that a warrant had issued for his arrest.  *Id.* ¶ 143.  No member of the MSP witnessed the threatening and assaultive conduct upon which the warrant was based.  *Id.* ¶¶ 3, 8.  Nor did they learn any information during the standoff that would call into question the basis for the warrant.  Thus, if there was any discriminatory "misperception" of Mr. Gerken's conduct, it would have been by the county officers applying for the warrant—not by MSP officers, who could reasonably rely on the warrant's finding of probable cause.  *See United States v. Leon*, 468 U.S. 897, 921 (1984) ("In the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient.")

Third, even assuming that Mr. Gerken lacked a culpable mental state, and that the MSP somehow should have known this, the police were still authorized to take Mr. Gerken into custody.  Pursuant to 34-B M.R.S. § 3862, law enforcement officers may take a person into custody, regardless of the person's ability to form criminal intent, based on probable cause that the person may be mentally ill and, due to that condition, presents a threat of imminent and substantial physical harm to that person or to other persons."  Given the obvious applicability of this alternative legal basis for action, MSP officers could not have discriminated against Mr. Gerken by trying to take him into custody even if they had reason to believe he could not form criminal intent.  *See Buchanan*, 417 F. Supp. 2d at 72 (holding that misperception claim failed

25

where police were aware that the subject was mentally ill and were taking him into protective custody).

### B. The MSP Did Not Violate the Reasonable Accommodations Requirement.

#### 1. The MSP Was Not Required to Provide Accommodations in the Midst of a Dangerous Standoff.

The second type of disability discrimination that can arise from police conduct is if the police fail to provide reasonable accommodations for a citizen's disability. *Buchanan*, 417 F. Supp. 2d at 73. This district, however, has long recognized the "exigent circumstances" exception to the general rule that public agencies must reasonably accommodate disabilities. *Norton*, 831 F. Supp. 2d at 361 (citing *Buchanan*, 417 F. Supp. 2d at 73). Under this exception, "the duty to reasonably accommodate does not come into play until the area is secure and there is no threat to human safety." *Buchanan*, 417 F. Supp. 2d at 73 (citing *Hainze v. Richards*, 207 F.3d 795, 802 (5th Cir. 2000)).[15]

In considering this exception in the *Vincent* case, Magistrate Judge Cohen ruled that it applied to an hour-long standoff between police and an armed, mentally disturbed individual. 2003 WL 22757940, at *9–10. The Court found that exigent circumstances existed even though the subject never pointed his gun at anyone and specifically told police that he would not shoot them, but rather wanted them to shoot him. *Id.* at *26. The Court reasoned that, despite his assurances, "[n]o one could know whether he might decide to fire his weapon or whether, even if he did not, his gun might discharge accidentally." *Id.*

---

[15] The Supreme Court recently granted certiorari to review a Ninth Circuit decision that held that the ADA imposed on police a duty to accommodate even in dangerous situations. The Supreme Court ultimately declined to rule on the ADA issue based on the failure of the defendants to brief the question that the Supreme Court wished to decide: whether the ADA is categorically inapplicable to arrests. *City and County of San Francisco*, 135 S. Ct. at 1772–74. There thus remains a split in the circuits, with this Court following the Fifth Circuit's narrower view.

Since *Vincent,* this Court has applied the exigent circumstances exception to at least two other confrontations between police and knife-wielding individuals with mental illness. *See Buchanan*, 417 F. Supp. 2d at 52, 73 (Woodcock, J.) (exigent circumstances existed when police entered the home of a mentally-ill individual based on concern he posed a risk to himself); *Norton*, 831 F. Supp. 2d at 348–57, 361 (Singal, J.) (exigent circumstances existed in four-hour standoff with mentally ill individual and potential hostage).

As in *Vincent, Buchanan,* and *Norton,* the undisputed facts here establish that, during the time MSP officers were interacting with Mr. Gerken, the scene was not secured and there was a continuing threat to human safety. Though he was laying on the ground, Mr. Gerken was still armed with a deadly weapon, which he repeatedly refused to put down. SSMF ¶¶ 5, 9, 11–12, 62–67, 156–160. Due to the wooded terrain, the police had to position themselves closer to Mr. Gerken than safety concerns would ordinarily dictate. *Id.* ¶ 42. Police were unable to safely surround Mr. Gerken, leaving him an avenue of escape. *Id.* ¶¶ 41, 44, 154. Mr. Gerken at one point shouted that he could "kill us all with one fingernail" and, at another point, while waving the knife, threatened to "cut" officers. *Id.* ¶¶ 50, 146–49. First responders had already used substantial non-deadly force on Mr. Gerken, which he successfully resisted. *Id.* ¶¶ 7, 12. These are not the hallmarks of a secure scene. Under these circumstances, MSP officers were under no legal obligation to provide accommodations.

### 2.  Mr. Gerken Was Provided All Accommodations that Were Reasonable Under the Circumstances.

Even assuming that the law required the MSP to reasonably accommodate Mr. Gerken's mental illness in the middle of a dangerous standoff, the MSP in fact provided all accommodations that were reasonable under the circumstances. As the Fourth Circuit has noted, regardless of whether there is a bright-line exigency exception to the ADA, exigency will still dictate which

accommodations, if any, are "reasonable." *Waller ex rel. Estate of Hunt v. Danville*, 556 F.3d 171, 175 (4th Cir. 2009). An accommodation that might be reasonable when a subject is unarmed—for example, bringing in a mental health professional to talk to him—may not be reasonable when the subject is armed with a deadly weapon. Here, for the reasons already discussed, Mr. Gerken continuously posed a threat to officers on the scene and to the public. As a result, if there was any obligation by the MSP to provide accommodations, it was a limited one.

Here, MSP fully satisfied any duty to provide reasonable accommodations to Mr. Gerken when it deployed its Crisis Negotiation Team to the standoff. *See id* at 176 (recognizing that calling in an experienced hostage negotiator to a hostage situation involving a mentally ill individual was an accommodation). The Team's negotiators have extensive training and experience in interacting with individuals with mental illness. SSMF ¶¶ 16, 53–60, 69–74. The lead negotiator, Sgt. Carleton Small, had 16 years of negotiation experience and had conducted numerous negotiations with mentally unstable individuals. *Id.* ¶¶ 52–60. Drawing upon his training and experience, Sgt. Small spoke to Mr. Gerken in an appropriate tone of voice and tried various techniques to establish a rapport with him. *Id.* ¶¶ 62–65, 75–76, 79–81; DSUMF ¶¶ 195–200. He was coached and assisted by the commander of the CNT, who also had substantial negotiation training and experience. SSMF ¶¶ 68–75, 79–81.

In addition, MSP officers provided Mr. Gerken with two other important accommodations: First, they took steps to gather information on Mr. Gerken, including information from his mental health records, for use in negotiations. *Id.* ¶¶ 23–24, 79–81; s*ee Waller*, 556 F.3d at 175 (recognizing that gathering information about a subject's mental health issues was a reasonable accommodation). Second, MSP officers, despite having probable cause to take him into custody immediately, gave Mr. Gerken over six hours to de-escalate, and took action only after Mr. Gerken

threatened the officers, the darkening woods increased the danger to law enforcement and the public, and the CNT commander concluded that negotiations were unlikely to succeed. *Id.* ¶¶ 140–41, 146–154 . *See Waller*, 556 F.3d at 177 (two-hour wait to de-escalate tensions before taking action in a hostage situation was an accommodation). These additional accommodations confirm that the MSP in fact provided Mr. Gerken with accommodations that were reasonable under the circumstances.

### C. The Plaintiff Has Not Alleged, And Cannot Prove, that MSP Policymakers Displayed Deliberate Indifference to Mr. Gerken's Rights.

The plaintiff's ADA claims are not against individual MSP officers on scene, but against the MSP itself. This Court has recognized that State entities are not vicariously liable under Title II of the ADA for the discriminatory acts of their employees. *Manuel v. City of Bangor*, No. 09-CV-339-B-W, 2009 WL 3398489, at *3 (D. Me. Oct. 21, 2009). Rather, when "lower-level" employees engage in discriminatory conduct, "discriminatory intent on the part of the governmental entity must be demonstrated in the form of deliberate indifference in order to recover money damages." *Id.* at *3 & n.3 (citing *Duvall v. Cty. of Kitsap*, 260 F.3d 1124, 1138 (9th Cir. 2001) and *Bartlett v. New York State Bd. Of Law Exam'rs*, 156 F.3d 321, 331 (2d Cir. 1998)).[16] "Deliberate indifference is demonstrated when the institution is provided with notice of harm to a federally protected right and an opportunity to rectify the situation, but fails to take reasonable measures to ensure compliance." *Id.* at *3 (citing *Wills v. Brown Univ.*, 184 F.3d 20, 41 (1st Cir. 1999) and *Duvall*, 260 F.3d at 1139). The Rehabilitation Act uses the same remedial scheme as the ADA, *see* 42 U.S.C. § 12133, and is therefore subject to the same standard.

---

[16] Some courts in other jurisdictions have held that the ADA and Rehabilitation Act permit vicarious liability claims. *See Reed v. State of Ill.*, No. 12-cv-7274, 2016 WL 2622312, *3–4 (N.D. Ill. May 9, 2016) (discussing caselaw). Last year, however, the U.S. Supreme Court in *City and County of San Francisco v. Sheehan* called these holdings into question when it criticized the defendants for failing to brief the vicarious liability issue, pointing out that it has "never decided" whether vicarious liability applies to ADA claims against police. 135 S. Ct. at 1774.

Under *Manual*, even if the plaintiff could establish that MSP officers on the scene discriminated against Mr. Gerken, it would not be enough. The plaintiff would need to further establish that policymakers at the MSP had notice that its officers were engaged in discriminatory acts and failed to take remedial measures. There is no way for the plaintiff to make such a showing. Not only is there no evidence that MSP policymakers knew of any discrimination problems, the record shows that MSP was in fact proactive in preventing disability discrimination by its officers. It maintains a policy on interacting with individuals experiencing mental health crises. SSMF ¶ 17. It maintains a Crisis Negotiation Team with expertise in communicating with individuals with mental illness. *Id.* ¶¶ 15–16. And, as shown below, it provided all of its officers with training on interacting with the mentally ill.

In short, even if discrimination against Mr. Gerken occurred—and it did not—the Plaintiff cannot make the showing necessary to hold the MSP as an entity liable for those acts.

**III.  The MSP is Entitled to Summary Judgment on Plaintiff's Failure-to-Train Claim.**

In Count III, plaintiff alleges that the MSP is liable for failing to properly train its officers in how to interact with mentally ill individuals. Am. Compl. ¶¶ 40–45. There is no such thing as a "failure-to-train" claim under the anti-discrimination laws, but even if there were, the undisputed facts demonstrate that the MSP properly trained its officers.

### A.  There Is No Independent "Failure-to-Train" Claim Under the Anti-Discrimination Laws.

Not the ADA, nor the Rehabilitation Act, nor the Maine Human Rights Act provides that public entities can commit a violation merely by failing to train personnel.[17]  The ADA provides

---

[17] In addition to the anti-discrimination statutes, the plaintiff cites Section 1983 as a basis for its failure-to-train claim against the MSP. Only "persons" are subject to Section 1983 claims, and it is well established that neither states nor their agencies are "persons" within the meaning of Section 1983. *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 64 (1989); *accord Nieves-Marquez v. Puerto Rico*, 353 F.3d 108, 124 (1st Cir. 2003). As a part of the

that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The Rehabilitation Act and MHRA both have virtually identical language. *See* 29 U.S.C. § 794(a); 5 M.R.S. § 4592(1)(E). As one court has explained, under the plain language of Section 12132, "a violation of Title II does not occur until there has been an exclusion or denial of participation in, or the benefits of, a public entity's services, which manifestly occurs well <u>after</u> any training of the public entity's agents." *Waller v. City of Danville, Virginia*, 515 F. Supp. 2d 659, 665 (W.D. Va. 2007), *aff'd sub nom. Waller ex rel. Estate of Hunt v. Danville, VA*, 556 F.3d 171 (4th Cir. 2009) (emphasis in original). Put another way, an agency's training, or lack thereof, is an internal matter between the agency and its employees. Not providing training does not, by itself, "exclude" anyone from participation in a public service or "deny" anyone a public benefit. Such an act of exclusion or denial requires some sort of interaction between the agency and someone with a disability. Moreover, if some such discriminatory interaction does occur, it is the interaction itself, not the training, that constitutes the act of exclusion or denial.

That is not to say that an agency's alleged failure to train its employees will always be irrelevant to Title II claims. Although there is no evidence that the MSP had any notice of a problem with disability discrimination, in a different case in which such notice could be established, a failure to train could be used to  establish the required "deliberate indifference" element of direct discrimination claims, as discussed in Part II.C. But where, as here, there is no evidence of any actual discrimination by officers on the scene, any failure to train by the MSP is legally irrelevant. *See Waller,* 556 F.3d at 177 n.3 ("[I]t is well-settled that the failure to train must

---

Maine Department of Public Safety, 25 M.R.S. § 2901, the MSP (referred to in statute as the "Bureau of State Police") is not subject to Section 1983.

have caused some violation of law for an action against a municipality to lie."); *see also J.H. ex rel. J.P.*, 2014 WL 3421037, at *85 ("It seems reasonably clear, however, that in the absence of proof of an underlying violation of [the] ADA, a failure-to-train claim would also fail.").

### B. The MSP Had Adequate Policies and Training for Dealing with the Needs of Individuals with Mental Illness.

In any event, the training provided by the MSP to its officers on the scene was sufficient as a matter of law.  Although the First Circuit has never recognized a failure-to-train claim under Title II, it has nonetheless provided clear guidance on how much training is needed to defeat such a claim, if it exists.  In *Buchanan*—another case in which police fatally shot a knife-wielding, mentally disturbed individual—the court assumed without deciding that Title II of the ADA imposed a duty to "draft policies and train officers on the needs of the mentally ill public." 469 F.3d at 177.  It then found that the defendant's training program was sufficient where (a) it maintained a policy on responding to "deviant behavior" that described when arrest or protective detention was appropriate; (b) it trained its officers on that policy and other relevant policies, such as its use of force policy; and (c) the officers received additional training "with respect to the identification of mentally ill persons and methods to employ when dealing with such persons."  *Id*.

The plaintiff argued that these measures were inadequate because they did not specifically teach officers how to "successfully communicat[e] with mentally ill individuals." *Id*. (emphasis in original).  The Court categorically rejected this argument, holding that "[a]n argument that police training, which was provided, was insufficient does not present a viable claim that Buchanan was 'denied the benefits of the services . . . of a public entity' by reason of his mental illness, as required under 42 U.S.C. § 12132."  *Id*.; *accord Higgins v. Reed*, No. 1:11-cv-00148, 2012 WL 3150813, at *12 (D. Me. Aug. 12, 2012) (rejecting ADA failure-to-train

where the law enforcement agency "did generally train its officers in dealing with the needs of the mentally ill.").

Assuming a failure-to-train claim exists under the ADA, *Buchanan* makes clear that it fails on the undisputed facts here. As in *Buchanan*, the MSP had a written policy on interacting with individuals with mental illness, requiring officers to "duly and diligently assist individuals who are or may be experiencing mental health crises." SSMF ¶ 17; DSUMF ¶ 238. The policy requires officers to be familiar with the law governing protective custody and commitment and sets forth the circumstances under which the police may arrest such individuals or take them into protective custody. SSMF ¶ 17; DSUMF ¶ 239. As in *Buchanan*, the MSP provided training on the policy to the officers on the scene. SSMF ¶¶ 60, 72, 179–189. And, as in *Buchanan*, the Tactical Team officers on the scene received at least annual training on encounters with persons exhibiting behavior indicative of mental illness. *Id.* ¶¶ 169–170. The officers received extensive additional training on various issues relating to dealing with mentally ill persons. SSMF ¶¶ 173–189.

Moreover, unlike in *Buchanan*, the officers on the scene here included experienced crisis negotiators, who had received extensive training in interacting with individuals with mental illness. *Id.* ¶¶ 15–16, 52–60, 68–74. Both the primary negotiator and the team commander had, less than a year earlier, taken a 40-hour course dedicated entirely to interacting with such individuals. *Id.* ¶¶ 54, 71. Other than the first responders, who spoke to Mr. Gerken largely under the supervision of the negotiator, no one on the scene other than the negotiators had any interactions with Mr. Gerken during the standoff. *Id.* ¶ 83. Indeed, MSP policy forbids any such interactions absent permission from the negotiators. *Id.* ¶ 82. In assessing whether officers on

the scene were adequately trained, the focus should be on the training of these specialists, not on the training of personnel who did not attempt to interact with Mr. Gerken.

## IV.  The Defendants Are Entitled to Summary Judgment on Plaintiff's State Law Claims.

The plaintiff asserts claims pursuant to the Maine Civil Rights Act ("MCRA"), 5 M.R.S. § 4682, and, apparently, tort common law.  Am. Compl. ¶¶ 54–62.[18]  The MCRA creates a cause of action for certain acts that violate state or federal law.  5 M.R.S. § 4682(1-A).  The MCRA "'was patterned after 42 U.S.C. § 1983,' and employs the federal standard for qualified immunity."  *Comfort v. Town of Pittsfield*, 924 F. Supp. 1219, 1236 (D. Me. 1996) (quoting *Grenier v. Kennebec County*, 733 F. Supp. 455, 458 n.6 (D. Me. 1990)).  Because the defendants have qualified immunity from plaintiff's Section 1983 claim, they are similarly immune from the MCRA claim.  *Berube*, 506 F.3d at 85 ("The disposition of a 42 U.S.C. § 1983 claim also controls a claim under the MCRA.");  *Jackson v. Town of Waldoboro*, 751 F. Supp. 2d 263, 275 (D. Me. 2010);  *see also Jenness v. Nickerson*, 637 A.2d 1152, 1159 (Me. 1994) ("Having found the Officers immune from the section 1983 claims, we also find them immune from claims under the MCRA.").

Under the Maine Tort Claims Act, a governmental employee[19] is entitled to immunity when performing a "discretionary function or duty" so long as the act is "reasonably encompassed by the duties of the governmental employee in question."  14 M.R.S. § 8111(1) & (1)(C).  "A law enforcement official's use of force is a discretionary act."  *Comfort*, 924 F. Supp. at 1236 (citing *Roy v. Inhabitants of City of Lewiston*, 42 F.3d 691, 697 (1st Cir. 1994) and

---

[18] In Counts VI and VII, plaintiff asserts claims for "wrongful death" and "conscious pain and suffering," respectively.  Am. Compl. ¶ 57–62.  Defendants assume that these claims are based on common law principles of tort liability.

[19] The Complaint also purports to name the Maine State Police as an entity in its two tort claims.  But as a governmental entity, the MSP is immune from tort claims.  14 M.R.S. § 8103.  None of the four statutory exceptions to immunity set forth in 14 M.R.S. § 8104-A even arguably apply here.

*Leach v. Betters*, 599 A.2d 424, 426 (Me. 1991)).  An officer is therefore immune from tort liability for a use of force so long as his use of force does not exceed the scope of his discretion. *Richards v. Town of Eliot*, 780 A.2d 281, 292 (Me. 2001).  A use of force that is "objectively reasonable" under the *Graham v. Connor* criteria meets this requirement.  *Id.*  As the First Circuit stated, if "officers' conduct was reasonable under the circumstances, that conduct cannot be said to be so egregious as to deprive the officers of the immunity defense, and they are entitled to summary judgment on the MTCA claim as well."  *Berube*, 506 F.3d at 86; *see also Jackson*, 751 F. Supp. 2d at 276.  Here, the defendants' conduct was objectively reasonable, and they are entitled to summary judgment on plaintiff's tort claims.

**Conclusion**

For the reasons stated above, the defendants respectfully request that the Court enter summary judgment in their favor as to all of plaintiff's claims.

DATED:  September 23, 2016                    JANET T. MILLS
                                              Attorney General


                                              /s/ Jonathan R. Bolton
                                              _____
                                              JONATHAN R. BOLTON
                                              CHRISTOPHER TAUB
                                              Assistant Attorneys General
                                              6 State House Station
                                              Augusta, Maine  04333-0006
                                              Tel.  (207) 626-8551
                                              Fax (207) 626-8518
                                              jonathan.bolton@maine.gov

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this, the 23rd day of September, 2016, I electronically filed the documents listed below with the Clerk of Court using the CM/ECF system, which will send a copy of such to counsel of record for all parties.

- Defendants' Motion for Summary Judgment with Incorporated Memorandum of Law

- Stipulated Statement of Material Facts (redacted)

- Defendants' Statement of Material Facts in Support of Their Motion for Summary Judgment (redacted)

I hereby further certify that on the 22nd day of September, 2016, I electronically filed the documents listed below with the Clerk of Court using the CM/ECF system, which sent a copy of such to all counsel of record for all parties.

- Declaration of Scott Dalton (redacted)

- Declaration of Nicholas Grass (redacted)

- Declaration of Jason Madore

- Declaration of Greg Mitchell (redacted)

- Declaration of Gregory Roy

- Declaration of Donald Shead (redacted)

- Declaration of Carleton Small

/s/ Jonathan R. Bolton
Jonathan R. Bolton
Assistant Attorney General
6 State House Station
Augusta, Maine  04333-0006
Tel.  (207) 626-8873
Fax (207) 626-8518
jonathan.bolton@maine.gov