# UNITED STATES DISTRICT COURT
# DISTRICT OF MAINE

| | | |
|---|---|---|
| MELISSA A. ADLE, Personal Representative of the Estate of Shad I. Gerken, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Docket No. 1:15-cv-458-NT |
| MAINE STATE POLICE DEPARTMENT et al., | ) ) ) | |
| Defendants. | ) ) | |

## ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

The Plaintiff, Melissa Adle, brings suit as the personal representative of the estate of Shad Gerken, asserting federal and state violations arising from the shooting of Mr. Gerken by the Maine State Police. The remaining[1] Defendants—the Maine State Police ("**MSP**"), Sargent Donald Shead, Sargent Nicholas Grass, and Detective Greg Mitchell—move for summary judgment on the Plaintiff's excessive force and disability discrimination claims, as well as the analogous claims under the Maine Civil Rights Act and the Maine Human Rights Act. Defs.' Mot. for Summ. J. (ECF No. 55). The individual Defendants contend that they are entitled to qualified immunity, and the MSP contends it did not discriminate against Mr. Gerken on account of his mental disability. For the following reasons, the motion is **GRANTED**.

---

[1] The parties agreed to dismiss the claims against Defendants State of Maine Department of Inland Fisheries and Wildlife, Brandi Alton, Ronald Dunham, and Michael Knights, which rendered Count One moot and narrowed the focus of Counts Three, Four, Five, Six, and Seven. Stipulation of Dismissal (ECF No. 23); First Amended Complaint ¶¶ 25-29, 40-62 (ECF No. 4).

# BACKGROUND

## I.     Shad Gerken's Initial Encounter with Law Enforcement

On September 27, 2014, in Chester, Maine, a caller notified the Penobscot County Sheriff's Office ("**PCSO**") at approximately 10:00 a.m. that a man, later identified as Shad Gerken, was walking on the Woodville Road, shouting at passing traffic, and carrying a knife. Statement of Material Facts ¶ 1 ("**SMF**") (ECF No. 56-1).[2] From a later report, the PCSO learned that Mr. Gerken also told an eight-year-old child who was retrieving mail to stop looking at him or he would kill her. SMF ¶ 1-3.

Mr. Gerken was 34 years old, stood five feet nine inches tall, weighed 200 pounds, and was muscular and capable of quick movement. SMF ¶¶ 13, 48. The knife he was carrying measured 11 inches, with a six inch blade. SMF ¶ 2. Throughout the ensuing encounter, Mr. Gerken was acutely psychotic, confused, unable to appreciate that his life was in danger, and unable to comply with police directives. SMF ¶ 246.

An officer from the PCSO and Game Warden Sargent Ronald Dunham were the first to respond. SMF ¶ 4. When the officers ordered Mr. Gerken to drop the knife, he fled into the woods. SMF ¶¶ 5-6, 257. The remainder of the encounter took place

---

[2]     The parties' statements of stipulated and disputed facts employ continuous paragraph numbering. The stipulated facts are found in paragraphs 1-189. (ECF No. 56-1). The Defendants' facts are in paragraphs 190-239. (ECF No. 56-2). The Plaintiff responds to these facts and provides additional facts in paragraphs 240-438. (ECF No 74-2). The Defendants' response to the Plaintiff's additional facts are in ECF No. 84-1. To simplify citations, I refer to all these documents collectively as the Statement of Material Facts ("**SMF**"). To the extent that I have incorporated one side's qualification or denial into the statement of the other, I have determined that the qualification or denial is supported by the record citations given. For the reasons provided by the Defendants, the requests to strike the Plaintiff's additional facts ¶¶ 247, 306, 338-40, 343-45, 352, 379, 382, and 409 are granted.

in woods thick with small and medium-sized trees and underbrush. Ex. L, Photo 9946. (ECF No. 66-6).

The officers pursued Mr. Gerken into the woods, and during the chase, Sgt. Dunham hit Mr. Gerken repeatedly with pepper spray in the face, to no observable effect. SMF ¶¶ 6-7. Mr. Gerken ignored the first responders' repeated commands to drop the knife. SMF ¶ 9.

At one point, Sgt. Dunham pushed Mr. Gerken into a tree and down to one knee. SMF ¶¶257-59. Sgt. Dunham grabbed the back of Mr. Gerken's blade with his left hand and attempted to twist the knife free of Mr. Gerken's grip. SMF ¶¶ 257-58. During this struggle, which lasted several minutes, Sgt. Dunham momentarily released his hold on the knife and punched Mr. Gerken on the right side of his face. SMF ¶¶ 263, 266. Sgt. Dunham sustained superficial cuts to his hand. SMF ¶ 261. Mr. Gerken also had blood on his hands, and his right eye eventually became swollen shut. SMF ¶¶ 265, 267. Mr. Gerken fell to the ground at the base of the tree. SMF ¶ 268. The first responders threatened to shoot Mr. Gerken if he stood. SMF ¶ 268. The time was approximately 10:50 a.m. SMF ¶ 392.

A Lincoln police officer arrived on the scene and deployed her Taser on Mr. Gerken four times as Sgt. Dunham alternatingly hit Mr. Gerken with pepper spray. SMF ¶¶ 10-12. At that point, Mr. Gerken was lying on the ground on his back, and he still did not drop his knife. SMF ¶¶ 11-12. The three officers formed a semi-circle perimeter around Mr. Gerken, standing approximately 6 feet from where he lay. SMF ¶ 269.

The fourth officer to arrive on the scene, MSP Trooper Thomas Fiske, determined that the six foot perimeter established by the first responders was too close, and he told Mr. Gerken that the officers would stand back. SMF ¶ 270. From a greater distance, Tpr. Fiske attempted to communicate with Mr. Gerken, who was mostly silent and non-responsive. SMF ¶¶ 21-22.

## II.   Maine State Police Crisis Negotiation and Tactical Teams Arrive

The MSP crisis negotiation team, comprised of officers trained to communicate with individuals who have threatened or inflicted serious injury or death to themselves or others, responded along with the MSP tactical team, composed of officers specially trained to respond to high-risk incidents. SMF ¶¶ 15-16, 25. Under MSP policy, the tactical team provides protection for the crisis negotiation team when it is deployed. SMF ¶¶ 26, 49.

Sargent Carleton Small was the first member of the crisis negotiation team to arrive on the scene at approximately 12:15 p.m. *See* SMF ¶ 19. He concluded that Tpr. Fiske was speaking in "an appropriately calm voice"[3] and that Tpr. Fiske should continue his efforts rather than have Sgt. Small take over right away. SMF ¶¶ 190-91.

---

[3]     The Plaintiff's expert opined that because of the negotiators' distance from Mr. Gerken, they had to shout to be heard by Mr. Gerken. *See* SMF ¶ 190. The parties have provided an audio recording of the first hour and twenty minutes of the incident. Approximately fifty minutes into that recording, the first responders have backed away and can be heard speaking to Mr. Gerken from the farther distance for the remainder of the recording. When Sgt. Small joined, he would have been at the same distance from Mr. Gerken as Tpr. Fiske. I have listened to the recording. Tpr. Fiske is speaking in a calm manner. He is not yelling commands, and he speaks respectfully and with concern for Mr. Gerken's well-being. Knight's Body Microphone Recording at 50:00 – 1:19:01 (ECF No. 81-1).

Corporal John Madore, the commander of the MSP crisis negotiation team, arrived on the scene at 12:45 p.m. SMF ¶ 19. Cpl. Madore coordinated with the PCSO to obtain an arrest warrant for Mr. Gerken on charges of criminal threatening with a dangerous weapon and aggravated assault based, respectively, on his statement to the eight-year-old child and his struggle over the knife with the game warden. SMF ¶¶ 20, 143. Cpl. Madore also learned from a deputy sheriff familiar with the family that Mr. Gerken's wife and children had moved out earlier that summer because Mr. Gerken was experiencing homicidal ideations. SMF ¶ 24.

Tactical team commander Sgt. Nicholas Grass arrived on the scene at 2:15 p.m. SMF ¶ 272. Eventually seven additional officers from the tactical team arrived—Sgt. Shead, Det. Mitchell, Sgt. Dalton, Sgt. Stetson, Tpr. Roy, Sgt. Michaud, and Sgt. Hamilton. SMF ¶¶ 32-37, 272. All of the tactical team members knew that Mr. Gerken was experiencing an acute mental health crisis. SMF ¶ 249. The individual Defendants—Sgt. Grass, Det. Mitchell, and Sgt. Shead—understood that Mr. Gerken was armed with a knife, that Sgt. Dunham had received a minor cut trying to disarm Mr. Gerken, and that pepper spray and a Taser had been used by the first responders without success.[4] SMF ¶¶ 192-94. Sgt. Grass was informed that Mr. Gerken was believed to be off his medication and that he was a survivalist. SMF ¶ 192.

---

[4]     The Plaintiff's expert James Baranowski opined that the Taser failed to work due to operator error, stating "typically these tactics work, especially the taser." SMF ¶ 359. The autopsy revealed no Taser burns. SMF ¶ 425. There is nothing in the record which would have put the MSP on notice that the Taser had not functioned properly.

The tactical team formed a semi-circle perimeter around Mr. Gerken, replacing the first responders. SMF ¶ 43. Using a clock face to help orient the reader,[5] with Mr. Gerken at the center of the clock, tactical team members took the following approximate positions:

- Sgt. Michaud at 7:00;

- Sgt. Grass at 6:30;

- Tpr. Roy at 6:00;

- The negotiators—Cpl. Madore, Sgt. Small and Tpr. Fiske—and Sgt. Stetson at 5:30;

- Sgt. Dalton and his K-9 at 4:30; and

- Sgt. Shead and Det. Mitchell at 3:00.

Pl.'s App'x. Ex. A ("**Forensic Map**") (ECF No. 65-14).

There is disagreement as to how far away the police were from Mr. Gerken throughout the standoff, and the estimates of the officers vary between 20 feet and 25 five yards.[6] Judging from the MSP forensic map, which the Plaintiff adopted as a

---

[5]     The Plaintiff offers a demonstrative exhibit, which is the forensic map of the site made by the MSP but which also plots the likely position where Mr. Gerken lay throughout the encounter based on Mr. Gerken's relationship to a blood-stained tree. Pl.'s App'x. Ex. A ("**Forensic Map**") (ECF No. 65-14). The Defendants agree that the Plaintiff's exhibit shows the approximate location of the blood-stained tree. SMF ¶ 401.

[6]     Sgt. Small estimated he was 20-30 feet away from Mr. Gerken. SMF ¶ 196. Cpl. Madore estimated the distance was 25 feet. Summ. of Interview of Cpl. Madore (ECF No. 66-17). Sgt. Small took over the position from Tpr. Fiske, who estimated he was 45 feet from Mr. Gerken. SMF ¶¶ 190-91. Sgt. Grass estimated he was a distance of 15-20 yards away from Mr. Gerken. SMF ¶ 196. Sgt. Mitchell and Tpr. Roy both estimated they were 10-15 yards away from Mr. Gerken. Summ. of Interview of Det. Mitchell 3 (ECF No. 66-15); Roy Decl. ¶ 14 (ECF No. 50). Sgt. Shead estimated he was 15 yards away from Mr. Gerken. Summ. of Interview of Sgt. Shead ¶ 6 (ECF No. 66-14). Sgt. Dalton estimated that he was about 25 yards away. Summ. of Interview of Sgt. Dalton ¶ 5 (ECF No. 66-16).

demonstrative exhibit, the officers were not exactly equidistant to Mr. Gerken and the different police officers were between 20 and 40 feet away. Forensic Map.

To maintain good sight lines on Mr. Gerken through the trees and brush, the perimeter established by the tactical team was closer to Mr. Gerken than Sgt. Grass preferred for officer safety. SMF ¶ 42. The semi-circle shape of the perimeter was a precaution against crossfire in the event that Mr. Gerken attacked one of the officers, but it left open a wide escape path should Mr. Gerken try to flee. SMF ¶¶ 41, 44.[7]

As a precaution, officers had closed the road near the scene to thru traffic and established an outer checkpoint to keep the public from entering the scene. SMF ¶¶ 290-93. No houses were visible in the immediate vicinity, though some were "walking distance" away. SMF ¶ 292.

Sgt. Grass, Sgt. Shead, Det. Mitchell, as well as three other members of the tactical team were each armed with H&K 416D semi-automatic rifles, ███████████ ████████████████████████████. SMF ¶¶ 275-76. The tactical team also wore camouflage and ballistic vests and helmets ████████████████████. SMF ¶¶ 46-47, 365. ██████████████████████████████████████

███████████████████████████████████████████

██████████████████. SMF ¶¶ 47, 280. ███████████████████

---

[7]      There was a police K-9 on the scene ████████████████████████
████████████. SMF ¶ 362. ███████████████████████████████████████. SMF
¶¶ 202-05, 360.

██████. SMF ¶ 281.

At around 2:10 p.m., when tactical team member Todd Stetson came to the perimeter, Mr. Gerken said, "that's a real warrior there." SMF ¶¶ 272-73. Shortly thereafter, around 2:20 p.m., Mr. Gerken became agitated. SMF ¶ 50. He yelled "you've got no ammo," "I am the angel of death, and I can kill us all with one fingernail," and "I had 30 minutes of lightning. What are you going to do?" SMF ¶ 50.

At 3:06 p.m., Sgt. Small of the crisis negotiation team took over from Tpr. Fiske as lead negotiator. SMF ¶ 300. Cpl. Madore relayed information to Sgt. Small that might facilitate communications, including Mr. Gerken's mental health diagnoses and disclosures to his therapists. SMF ¶ 79. The negotiators learned that Mr. Gerken had various mental health diagnoses, including schizophrenia, type I bipolar disorder with psychotic features, attention deficit disorder, posttraumatic stress disorder, and possible borderline personality disorder. SMF ¶¶ 240, 253.

Sgt. Small attempted to persuade Mr. Gerken to put down his knife. He spoke to Mr. Gerken about his children, assured him that the police would not approach or hurt him, and offered food, water, and medical care if Mr. Gerken put down the knife. SMF ¶¶ 62, 301. Sgt. Small told Mr. Gerken not to stand up with his knife in his hand and presented a "surrender plan" that Mr. Gerken could follow to safely turn himself in to police. SMF ¶¶ 63-65. Mr. Gerken was mostly unresponsive, but he did say "no" and shake his head in response to requests that he put down the knife. SMF ¶¶ 66-67, 297.

Sgt. Grass, as commander of the tactical team, created a plan for taking Mr. Gerken into custody in the event that the negotiations failed. SMF ¶ 87. The plan revolved around the use of a fire hose that would be sprayed at Mr. Gerken to pin him to the ground and force the knife from his hand. SMF ¶¶ 86-90. This would allow four other tactical team members to converge on Mr. Gerken and take him into custody. SMF ¶¶ 86-90. Sgt. Grass had attended a presentation several years prior on the safe use of fire hoses to subdue dangerous individuals. SMF ¶ 113. Tpr. Roy had received instruction and experience in the use of a fire hose in June 2014, three months prior. SMF ¶¶ 115-18.

Lincoln Fire Department firefighters provided the equipment and instructed Tpr. Roy on the use of the hose, including the operation of the nozzle, which was consistent with the instruction he had received in June. SMF ¶¶ 138-39. Both Cpl. Madore and Tpr. Roy conferred with the firefighters about choosing the nozzle that would deliver the most concentrated, forceful spray. SMF ¶¶ 132, 137. The firefighters assured Tpr. Roy that the nozzle chosen was the best one to achieve a focused beam of water and that their equipment would discharge water with enough force to pin a person to the ground. SMF ¶¶ 136-37.

In addition, Sgt. Michaud, who was chosen to be one of the four tactical team members who would converge on Mr. Gerken, would be armed with a 40mm foam baton launcher, which he would fire at Mr. Gerken to cause abrupt pain and force Mr. Gerken to drop the knife. SMF ¶¶ 91-95. Sgt. Michaud had extensive training in using the foam baton launcher. SMF ¶ 93. Sgt. Grass communicated the plan and

requested feedback from the tactical team and crisis negotiation team and heard no objection. SMF ¶¶ 98-99.

At some point during the afternoon, Sgt. Grass, Det. Mitchell and Sgt. Shead were informed that the PCSO had obtained the warrant for Mr. Gerken's arrest on criminal charges including criminal threatening with a dangerous weapon and aggravated assault. SMF ¶ 143. Although Sgt. Grass had developed a tactical plan and had a warrant for Mr. Gerken's arrest, he decided that negotiations should be given more time. SMF ¶ 145.

Mr. Gerken did not present a risk of immediate bodily harm to the tactical team while he was lying on the ground. SMF ¶ 320. Mr. Gerken had complied for hours with the instruction not to get up with a knife in his hand. SMF ¶ 324.

## III. The Application of Less-Than-Lethal Force

As the afternoon progressed, members of the tactical team found it increasingly difficult to see Mr. Gerken clearly in the dwindling light. SMF ¶ 140. Shortly after 5:00 p.m., while Sgt. Small was talking to Mr. Gerken about his children and having the strength to survive, Mr. Gerken, while still lying on his back, raised his arms and began swiping his knife through the air. SMF ¶ 146. Some members of the tactical team heard Mr. Gerken say "I'll cut you" or words to that effect. SMF ¶ 147.

Cpl. Madore and Sgt. Grass discussed the danger posed by the onset of darkness,[8] the alarming nature of Mr. Gerken's most recent outburst, and the fact

---

[8]        Darkness alone is an insufficient justification for a tactical intervention if artificial lighting is available. SMF ¶ 327. The tactical team previously used a vehicle called a ▮▮▮▮ that had portable lighting, but the ▮▮▮▮ was not on the scene, and, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. SMF ¶ 330. There were also specific tactical concerns about using

that no progress had been made in almost seven hours of attempted negotiations. SMF ¶ 151. Cpl. Madore told Sgt. Grass that he did not believe further negotiations were likely to be successful and that he had no reservations about employing a tactical intervention. SMF ¶ 152. Sgt. Grass decided that it was necessary to take Mr. Gerken into custody because: (i) Cpl. Madore had concluded that further negotiation was unlikely to be successful; (ii) Mr. Gerken continued to display threatening and violent behavior, and (iii) the deteriorating visibility increased the risk to tactical team members and the risk that Mr. Gerken would escape and endanger local residents or first responders stationed at the command post. SMF ¶ 154.

At approximately 5:15 p.m.,[9] Cpl. Madore applied the negotiation technique of a last opportunity to surrender. SMF ¶¶ 156-58. Cpl. Madore told Mr. Gerken four times that he was under arrest, his safety was no longer guaranteed, and he must drop the knife, stand up with his hands raised, and walk toward Cpl. Madore's voice. SMF ¶¶ 156, 160. Cpl. Madore had seen this tactic succeed on prior occasions. SMF ¶ 158. Mr. Gerken looked at Cpl. Madore, but then lowered his head and remained on the ground. SMF ¶ 159.

Shortly afterward, Sgt. Grass gave the order to activate the fire hose, fire the baton rounds,[10] and advance toward Mr. Gerken. SMF ¶ 372. Det. Mitchell and Sgt.

---

portable lighting in the woods, which would be impossible to illuminate evenly. SMF ¶ 331. The parties do not dispute that the officers found it increasingly difficult to see Mr. Gerken clearly. SMF ¶ 140.

[9]     Cpl. Madore noted that he gave the last opportunity warnings at 5:17. Summ. of Interview of Cpl. Madore 4.

[10]     The parties also refer to the projectiles as beanbag rounds or rubber bullets. *See* SMF ¶ 404. For consistency, I will refer to them as baton rounds.

Shead advanced toward Mr. Gerken from the right end of the perimeter, and Sgt. Grass and Sgt. Michaud advanced from the left. SMF ¶¶ 164-65. The water from the fire hose neither pinned Mr. Gerken to the ground nor dislodged the knife from his grip. SMF ¶ 166. Instead, Mr. Gerken stood up. SMF ¶ 167.

## IV. The Application of Lethal Force

After Mr. Gerken got up, the situation unfolded very quickly. Statements given the night of the incident by Sgt. Grass, Det. Mitchell, and Sgt. Shead tell a consistent story, even though the perspective of these officers varied.[11] Mr. Gerken initially tried to run away from the tactical team and the water spray. SMF ¶ 385. Mr. Gerken "changed direction, moving towards Sgt. Shead and Det. Mitchell, as they advanced from the right side of the perimeter." SMF ¶ 209.[12] Sgt. Grass (who was advancing

---

[11] Mindful of my obligation in an excessive use of lethal force claim to examine the record, I carefully reviewed the statements that the officers provided on the night of the shooting. *See Flythe v. D.C.*, 791 F.3d 13, 19 (D.C. Cir. 2015); Summ. of Interview of Sgt. Dalton ¶ 5; Summ. of Interview of Sgt. Grass ¶ 24 (ECF No. 66-13); Summ. of Interview of Tpr. Roy 3 (ECF No. 66-21); Summ. of Interview with Det. Mitchell 5; Summ. of Interview of Det. Stetson 3 (ECF No. 66-18); Summ. of Interview of Sgt. Shead ¶ 13; Summ. of Interview of Sgt. Small ¶ 8 (ECF No. 66-19). The officers were sequestered and did not speak to each other or any other tactical team members before providing statements to the Maine Attorney General investigators, who initiated an investigation into the officers' use of deadly force in the performance of official duties. SMF ¶¶ 235, 426. Brian McMaster of the Maine Attorney General's office sent the draft factual report to Sgt. Grass for his review and comments. SMF ¶ 427. The investigation concluded that the facts precluded a criminal prosecution. Report of the Attorney General 5 (ECF No. 62-7).

[12] The Plaintiff denies SMF ¶ 209, claiming that "[n]one of [the statements relied on by the Defendants] support the allegation that Mr. Gerken changed direction to run directly at Sgt. Shead and Det. Mitchell." SMF ¶ 209. The Plaintiff's denial of SMF ¶ 209 is actually a qualification. I accept that none of the officers claim that Mr. Gerken ran "directly" at the officers. Defendants' supported assertion in SMF ¶ 209 contends only that Mr. Gerken was moving towards Sgt. Shead and Det. Mitchell as they advanced. In addition to the statements of Det. Mitchell, Sgt. Shead, and Sgt. Grass, Sgt. Dalton stated that he perceived Mr. Gerken running to Dalton's right, in the "general direction" of Sgt. Shead and Det. Mitchell. SMF ¶¶ 209, 388. Tpr. Roy stated his vision was obscured by the spray. SMF ¶ 209. Only Cpl. Madore, who was not advancing towards Mr. Gerken with the tactical team, failed to mention during his interview on the night of the shooting that Mr. Gerken turned to the right. In his interview, Cpl. Madore described seeing Mr. Gerken run toward the back of the perimeter and then hearing shots. SMF ¶ 209. In a report completed by Cpl. Madore and in a later declaration, Cpl. Madore did state that Mr. Gerken changed direction and began to run towards the

from the 6:30 position) saw Mr. Gerken come upon a blowdown of trees and change direction, quartering[13] towards Det. Mitchell and Sgt. Shead. SMF ¶¶ 389-90. Det. Mitchell stated that Mr. Gerken was moving towards him and Sgt. Shead. SMF ¶ 209. Sgt. Shead said he initially lost sight of Mr. Gerken in the spray of the fire hose but when he regained sight of him, Sgt. Shead perceived Mr. Gerken to be on his feet and less than 20 feet from Det. Mitchell and himself. SMF ¶ 211-12.

Sgt. Shead said that he then perceived that Mr. Gerken posed an imminent threat, and he fired several shots at Mr. Gerken from his rifle. SMF ¶ 215. The parties agree that after Sgt. Shead shot Mr. Gerken, Mr. Gerken fell to the ground. He was approximately 20 feet from his initial location, 18.61 feet away from Det. Mitchell, 12-13 feet from Sgt. Grass, and 19.57 feet from Sgt. Shead. SMF ¶¶ 223, 401; Forensic Map.

Det. Mitchell shouted at Mr. Gerken to stop moving and stay on the ground. SMF ¶ 220. Sgt. Grass, Det. Mitchell, and Sgt. Shead each saw Mr. Gerken in the process of getting back to his feet with the knife still in his hand. SMF ¶ 222. Cpl. Madore described Mr. Gerken sitting up and beginning to lunge forward with the knife in his hand. SMF ¶¶ 216, 224. Based on their perception that Mr. Gerken posed an imminent threat, Sgt. Grass, Det. Mitchell, and Sgt. Shead fired additional rounds at Mr. Gerken. SMF ¶¶ 225-26.

---

Tactical Team members approaching him from the right. Madore Rpt. 5 (ECF No. 63-9); Madore Decl. ¶ 70 (ECF No. 48).

[13]    "Quartering" describes a right angle turn. WEBSTER'S THIRD NEW INT'L DICTIONARY (3d ed. 2002).

When firing ceased, Sgt. Shead, one of the tactical team medics, determined that Mr. Gerken had no vital signs, and EMTs confirmed that Mr. Gerken had died, marking the time of death as 5:20 p.m. SMF ¶¶ 227, 230, 392.

In total, the tactical team fired 28 bullets at Mr. Gerken during the incident. SMF ¶ 417. Sgt. Grass fired 13 bullets, Sgt. Shead fired 9, and Det. Mitchell fired 6. SMF ¶ 417. Between 25 to 27 of the bullets hit Mr. Gerken. SMF ¶ 421. The autopsy report shows that most of the bullets entered Mr. Gerken's body from the back. SMF ¶ 422. Most of the gunshot wounds went from left to right, although the entrance to the head was on the right side and traveled left. SMF ¶ 424. The report confirmed two entrance wounds on the front abdomen. SMF ¶ 421. The report showed 14 entrance wounds on the back body, 2 on the right shoulder that reentered the base of the head, 1 on the left tricep, and 2 on the right arm. SMF ¶ 421. The report also recorded a gaping wound on the left anterior thigh, consistent with a cluster of 4 to 6 entrance wounds, and Mr. Gerken's head suffered "explosive destruction." SMF ¶ 421.

## V. MSP Training in Dealing with Individuals with Mental Illness

All MSP officers are required to review certain MSP general orders annually, including M-1 on the use of force, M-2 on response to barricaded or hostage situations, and M-3 on response to individuals experiencing mental illness. SMF ¶ 168. The M-3 general order states: "The policy of the Maine State Police is to duly and diligently assist individuals who are or may be experiencing mental health crises." SMF ¶ 238. The policy includes standards for arresting or taking an individual into protective custody where the officer has probable cause to believe that an individual is experiencing a mental health crisis." SMF ¶¶ 17, 238.

Tpr. Fiske, the initial negotiator on the scene, had additional training in basic hostage negotiation (40 hours), ADA for law enforcement, police response to people with disabilities, and law enforcement interactions with people with autism. SMF ¶ 181.

Members of the crisis negotiation team have specialized training in communicating with individuals experiencing mental health crises and with armed and unarmed standoffs. SMF ¶ 16. The crisis negotiation team trains together for 12-13 days per year, which typically includes scenario-based exercises, as well as lectures. SMF ¶¶ 57-58. Sgt. Small and Cpl. Madore are certified as negotiators from the Maine Criminal Justice Academy, which requires training in abnormal psychology assessment, crisis/suicide intervention, active listening and communication skills, assessment of a person's emotional stability, and crisis resolution. SMF ¶¶ 55-56, 66. Both had training on interacting with individuals with mental illness, including a 40-hour FBI negotiation course and a 40-hour course presented by the National Alliance for the Mentally Ill. SMF ¶¶ 54, 71.

The tactical team's annual training, since 2010, has included encounters with persons exhibiting behavior indicative of mental illness and on the use of deadly force. SMF ¶ 170. The tactical team also trains at least annually with the crisis negotiation team. SMF ¶ 171. A portion of tactical team training is scenario-based and regularly involves individuals who appear to suffer from mental illness. SMF ¶172. In April 2011, members of the tactical team were required to attend a two-hour training on dealing with emotionally disturbed people, taught by a presenter from Community

Health and Counseling Services Crisis Service in Bangor. SMF ¶ 173. Defendant Shead did not attend this training. *See* SMF ¶ 174. In September 2012, members of the tactical team were required to attend a four-hour training on bath salts and mentally disturbed people presented by the Brewer Police Department. SMF ¶ 175. All named defendants attended this training. SMF ¶ 176. In December 2013, members of the tactical team were required to attend a four-hour training on dealing with mentally ill individuals, presented by the crisis negotiation team. SMF ¶ 177. All named defendants attended this training. SMF ¶ 178. Sgt. Grass, Sgt. Shead, and Det. Mitchell, as well as tactical team members Dalton, Michaud, and Hamilton, also had training in ADA for law enforcement and police response to people with disabilities. SMF ¶¶ 180, 182, 183, 185-87.

## LEGAL STANDARD

Summary judgment is warranted where the moving party shows that there is no genuine dispute of material fact and that the movant is entitled to summary judgment as a matter of law. Fed. R. Civ. Pro. 56(a). A fact is material where it could influence the outcome of the litigation. *Oahn Nguyen Chung v. StudentCity.com, Inc.*, 854 F.3d 97, 101 (1st Cir. 2017). A dispute is genuine where a reasonable jury could resolve the point in favor of the non-moving party. *Id.* In deciding a motion for summary judgment, the court must construe "all the facts in the light most flattering to the nonmoving party, resolving any evidentiary conflicts in that party's favor, and drawing all reasonable inferences therefrom to his behoof." *Id.* (quoting *Gomez v. Stop & Shop Supermkt. Co.*, 670 F.3d 395, 396 (1st Cir. 2012)).

The intersection between summary judgment and qualified immunity can be tricky to navigate. *Morelli v. Webster*, 552 F.3d 12, 18 (1st Cir. 2009).

> The difficulty arises because the summary judgment standard requires absolute deference to the nonmovant's factual assertions (as long as those assertions are put forward on personal knowledge or otherwise documented by materials of evidentiary quality), whereas qualified immunity, when raised on summary judgment, demands deference to the reasonable, if mistaken actions of the movant. In order to ease this inherent tension, we think it wise for courts to cabin these standards and keep them logically distinct, first identifying the version of events that best comports with the summary judgment standard and then asking whether, given that set of facts, a reasonable officer should have known that his actions were unlawful.

*Id.* at 18-19 (internal citations omitted). "Because determining reasonableness in [the excessive force] context is such a fact-intensive endeavor, summary judgment is improper if the legal question of immunity turns on which version of the facts is accepted." *Id.* at 25 (quoting *Griffith v. Coburn*, 473 F.3d 650, 656-57 (6th Cir. 2007); *see also Tolan v. Cotton*, 134 S. Ct. 1861, 1866-68 (2014) (disputes of fact included whether the victim was verbally threatening or moving toward the officers when the shooting occurred).

Particularly in assessing a deadly force claim, courts "may not simply accept what may be a self-serving account by the police officer" where "the witness most likely to contradict [the officer's] story—the person [he] shot dead—is unable to testify." *Flythe v. D.C.*, 791 F.3d 13, 19 (D.C. Cir. 2015) (quoting *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994)). In such instances, courts must "carefully examine all the evidence in the record . . . to determine whether the officer's story is internally consistent and consistent with other known facts." *Id.* (quoting *Scott*, 39 F.3d at 915).

This includes "the circumstantial evidence that, if believed, would tend to discredit the police officer's story." *Id.* (quoting *Scott*, 39 F.3d at 915).

## DISCUSSION

### I.    Qualified Immunity for Individual Defendants

The Plaintiff alleges in Counts Two and Five that Sgt. Grass, Sgt. Shead, and Det. Mitchell used excessive force against Mr. Gerken in violation of the Fourth Amendment and the Maine Civil Rights Act, ("**MCRA**"), 5 M.R.S.A § 4682. The individual Defendants seek summary judgment, arguing that they are entitled to qualified immunity on Counts Two and Five because the undisputed facts establish that they did not use excessive force in violation of the Fourth Amendment and that they did not violate a clearly established right.

#### A.    The Applicable Law

Government officials are entitled to qualified immunity unless their conduct constitutes a violation of federal law that was "clearly established" at the time. *Saucier v. Katz*, 533 U.S. 194, 201-06 (2001). "Qualified immunity is a judicial gloss designed to allow public officials to perform discretionary tasks without the constant threat of legal liability . . . . the doctrine is intended to protect 'all but the plainly incompetent [and] those who knowingly violate the law.'" *Morelli*, 552 F.3d at 18 (internal citation omitted) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

Qualified immunity claims at the summary judgment stage are analyzed in two-steps. *Maldonado v. Fontanes*, 568 F.3d 263 (1st Cir. 2009) (adopting the two-pronged qualified immunity test from *Pearson v. Callahan,* 555 U.S. 223 (2009)).

> A court must decide: (1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was "clearly established" at the time of the defendant's alleged violation.

*Id.* at 269.

> [T]he second, "clearly established" step of the qualified immunity analysis . . . has two aspects. One aspect of the analysis focuses on the clarity of the law at the time of the alleged civil rights violation. To overcome qualified immunity, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." The other aspect focuses more concretely on the facts of the particular case and whether a reasonable defendant would have understood that his conduct violated the plaintiffs' constitutional rights.

*Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "[W]hile it is frequently appropriate for courts to answer each step in turn, it is not mandatory that courts follow the two-step analysis sequentially." *Id.* at 269-70.

### 1. Step One: Violation of a Constitutional Right

When a plaintiff alleges excessive force in effecting an arrest, the federal right at issue is the Fourth Amendment prohibition of unreasonable seizures. *Graham v. Connor*, 490 U.S. 386, 394 (1989). "[T]he right to make an arrest . . . necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Id.* at 396. The force used must be "objectively reasonable" under the circumstances. *Id.* at 397. Reasonableness turns on a balancing of the nature and quality of the intrusion on the individual's Fourth Amendment rights against the government interests in effecting the seizure. *Scott v. Harris*, 550 U.S. 372, 383 (2007).

The assessment of reasonableness requires "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. Courts must view the circumstances from the perspective of a reasonable officer on the scene and take into account that officers make "split-second" judgment calls about the quantum of force in "tense, uncertain, and rapidly evolving" situations. *Id.* at 396-97.

### 2. Step Two: Clearly Established Law

#### a. Clarity of the Law at the Time of the Violation

At step two, the Plaintiff must show that Mr. Gerken's right to be free of this level of force was clearly established at the time of the alleged violation. *Eves v. LePage*, 842 F.3d 133, 141 (1st Cir. 2016). Qualified immunity is not available where the law was so clearly established that a reasonable officer would know that the law applied to these facts. The crux of the qualified immunity analysis is whether the officers had "fair notice" that they were acting unconstitutionally. *Hope v. Pelzer*, 536 U.S. 730, 739 (2002). "[T]he clearly established law must be 'particularized' to the facts of the case," *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (quoting *Anderson*, 483 U.S. at 640). A "case presenting the same set of facts" is not necessary, however, to hold that defendants "had fair warning." *Mlodzinski v. Lewis*, 648 F.3d 24, 38 (1st Cir. 2011).

Precedent "supplies a crystal clear articulation of the right, grounded in the Fourth Amendment, to be free from the use of excessive force by an arresting officer."

*Morelli*, 552 F.3d at 23. More specifically, the law has long recognized that "[t]he intrusiveness of a seizure by means of deadly force is unmatched," and, accordingly deadly force is excessive as a matter of law unless an objectively reasonable officer would have thought that the individual posed an immediate threat. *Tennessee v. Garner*, 471 U.S. 1, 3, 9 (1985); *Young v. City of Providence*, 404 F.3d 4, 22-23 (1st Cir. 2005).

The law is also clear that force must be proportional to the threat posed, "and as the threat changes, so too should the degree of force." *Cyrus v. Town of Mukwonago*, 624 F.3d 856, 863 (7th Cir. 2010) ("Force also becomes increasingly severe the more often it is used; striking a resisting suspect once is not the same as striking him ten times."); *see also Jennings v. Jones*, 499 F.3d 2, 16 (1st Cir. 2007) (holding that an increase of police force after arrestee ceased resisting arrest was clearly unconstitutional).

### b.      Focusing on the Context of the Case

At the second step, I must focus on the particular facts of the case. "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments . . . ." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011). The question here is whether the "use of excessive force constituted the type and kind of erroneous judgment that a reasonable police officer under the same or similar circumstances might have made." *Morelli*, 552 F.3d at 24. If a reasonable public official, situated similarly to the defendant, should have understood that his conduct violated the relevant right, then qualified immunity is not available.

## B. Application of the Law to the Facts Presented in the Light Most Favorable to the Non-Movant

The Plaintiff argues that both the decision to employ the fire hose in the first instance and the shooting of Mr. Gerken constitute violations of Mr. Gerken's Fourth Amendment rights. I address each argument in turn.

### 1. Sgt. Grass's Decision to Implement a Tactical Plan and Use the Fire Hose

In order to determine if a constitutional violation has occurred, I must balance the strong government interest in taking Mr. Gerken into custody against Mr. Gerken's Fourth Amendment right to be free from the less-than-lethal force of a fire hose. *See Scott*, 550 U.S. at 383.

Looking to the "reasonableness" factors, I first focus on the severity of the crimes at issue. The police had a warrant for Mr. Gerken's arrest on felony charges of aggravated assault and criminal threatening with a dangerous weapon. The Plaintiff contends that the severity of the charges were overstated given Mr. Gerken's mental state. Pl.'s Opp'n to Defs.' Mot. for Summ. J. 12, 30 (ECF No. 72). But at the arrest stage, the police are not required to have proof beyond a reasonable doubt that Mr. Gerken had the requisite mens rea to commit the crime. Here, an independent judicial official had reached a conclusion that there was probable cause to believe that Mr. Gerken had committed two felony offenses involving violence. *See Hunter v. Bryant*, 502 U.S. 224, 227 (1991) ("Even law enforcement officials who 'reasonably but mistakenly conclude that probable cause is present' are entitled to immunity.") (quoting *Anderson*, 483 U.S. at 641).

As to the second "reasonableness" factor—whether he posed an immediate threat—it is undisputed that Mr. Gerken was in an emotionally disturbed state. Although he posed no immediate threat while he was lying on the ground, there was no guarantee that he would not get up at any point and either attack or attempt to escape. The tactical team, to avoid a cross-fire situation, had set up positions in a semi-circle around Mr. Gerken, leaving Mr. Gerken, a survivalist, an escape route into the forest. Mr. Gerken had doggedly held onto the knife despite numerous tactics to disarm him. The first responders repeatedly used a Taser and pepper spray at close range, and Sgt. Dunham attempted to physically wrest the knife away from Mr. Gerken. Despite almost seven hours of negotiations, the police had been unable to convince Mr. Gerken to drop the knife and surrender. Shortly before Sgt. Grass made the decision to implement the tactical plan, Mr. Gerken had gestured with the knife in a threatening manner when he repeated words to the effect of "I will cut you." The Plaintiff argues that a reasonable jury could infer that Sgt. Grass elevated the seriousness of that comment to create an "action imperative," Pl.'s Opp'n 19-20, but taking that comment seriously was prudent police practice.

The fact that Mr. Gerken was delusional does not preclude him from being an immediate threat. The police had a strong interest in taking Mr. Gerken into protective custody. Maine's protective custody statute authorizes law enforcement to take an individual into custody, regardless of his ability to form criminal intent, based on the "probable cause to believe that the person may be mentally ill and that due to that condition the person presents a threat of imminent and substantial harm to that

person or other persons." 34-B M.R.S. § 3862. Mr. Gerken's persistent delusions and the failure of negotiation to convince Mr. Gerken to release the knife justified protective custody.

As the sun began to sink, the threat that Mr. Gerken posed to himself, the police, and the greater community increased. Plaintiff cites her expert James Baranowski for the proposition that "the onset of darkness is not a valid tactical concern and is not a justification to rush." Pl.'s Opp'n 8.[14] At summary judgment, however, the focus is on whether the officers acted reasonably in the circumstances, as viewed from the perspective of an officer on the scene and not with "the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396-97; *see also Hegarty v. Somerset Cty.*, 53 F.3d 1367, 1377 (1st Cir. 1995) ("[o]fficers need not avail themselves of the least intrusive means of responding to an exigent situation; they need only act within that range of conduct [which is] . . . reasonable." (quoting *Scott*, 39 F.3d at 915)). "It is easy in retrospect to say that officers should have waited, or should have used some other maneuver—these propositions cannot be falsified—but *Graham* makes it clear that the fourth amendment does not require second-guessing." *Bell v. Irwin*, 321 F.3d 637, 640 (7th Cir. 2003). The fact that darkness increased the danger to the police and the community in this wooded environment is a matter of common sense. Although the Plaintiff claims that Sgt. Grass raised spurious concerns about impending darkness,

---

[14]     On closer look, what Baranowski said was that darkness is not a concern because the police can bring in artificial lighting. SMF ¶ 327. Det. Mitchell testified, however, that ███████████████████████████████████████████████████. SMF ¶ 330. Further, artificial lighting, perhaps effective in a parking lot, would have left dangerous shadows in the woods. SMF ¶ 331.

Pl.'s Opp'n 21, no reasonable juror could conclude that impending darkness under these circumstances was not a valid concern.

The final "reasonableness" factor is whether the suspect is actively resisting arrest or attempting to evade arrest by flight. Here, Mr. Gerken had actively resisted the attempts by the first responders to disarm and apprehend him, and he had been mostly nonresponsive to the attempts to get him to voluntarily drop the knife during negotiations. Although Mr. Gerken's resistance may have been the product of his mental illness, he had been resisting the police officers attempts to take him into custody for nearly seven hours.

The Plaintiff contends that Sgt. Grass chose the fire hose to provoke Mr. Gerken so they could shoot him. Pl.'s Opp'n 21. The claim is unsupported. Sgt. Grass's plan was to pin Mr. Gerken down with the fire hose and attempt to force the knife from his hand while four officers converged from different directions to take him into custody. If the knife was not knocked away by the force of the hose, Sgt. Michaud was to use the foam baton launcher to cause abrupt pain thereby causing Mr. Gerken to drop the knife. While it is true that the tactical team had never trained together on the use of a fire hose, Sgt. Grass had attended a presentation on using fire hoses to safely subdue dangerous individuals. Sgt. Grass chose Tpr. Roy, who had recent instruction on the technique, to operate the hose. The Lincoln Fire Department personnel familiar with the hose assured the police that it would have sufficient pressure to pin Mr. Gerken to the ground. The fact that the fire hose did not have sufficient pressure to pin down Mr. Gerken was unfortunate, but nothing in the

record allows an inference that Sgt. Grass intended to use the hose to provoke Mr. Gerken to stand in order to justify lethal force. On this record, no reasonable juror could conclude that the police had such a nefarious motive.

The realities of the situation—impending nightfall in a wooded environment with an armed, emotionally disturbed individual—left the police with limited options. The police had already unsuccessfully tried the Taser, pepper spray, and extended negotiations, ███████████████████████████████████. Assessing the evidence in the light most favorable to the non-movant, no reasonable juror could conclude that Sgt. Grass's implementation of a less-than-lethal plan involving the fire hose was an objectively unreasonable choice in violation of Mr. Gerken's Fourth Amendment rights.

### 2. The Shooting of Mr. Gerken

The individual Defendants also claim that they are entitled to qualified immunity for the shooting of Mr. Gerken. There are two factual scenarios to be analyzed. First, I must consider whether the initial shots fired at Mr. Gerken by Sgt. Shead are protected by qualified immunity. Second, I analyze whether Sgt. Grass, Det. Mitchell, and Sgt. Shead's firing of additional rounds after Mr. Gerken had already fallen are also protected by qualified immunity.

### a. Sgt. Shead's Shots

On this claim, I skip over the question of whether Sgt. Shead's first shots were objectively reasonable and focus on whether the right to be free from deadly force in these circumstances was clearly established and whether Sgt. Shead's actions were such that no reasonable officer in his position would have made the same choice.

### i. Clearly Established Law

At a general level, it is clearly established that the Fourth Amendment prohibits the use of excessive force by an arresting officer. *Morelli*, 552 F.3d at 23-24. It is also clearly established that the use of deadly force is justifiable only to prevent escape when an "officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *Garner*, 471 U.S. at 3. In *Garner*, an officer shot an unarmed young man who had been caught in the act of committing a burglary and was attempting to escape. The suspect posed no immediate threat, and the Court held that the use of deadly force was not justified under the Fourth Amendment in such a case.

As the Supreme Court recently reiterated however, *Garner* establishes the law for "an obvious case." *White*, 137 S. Ct. at 552 (quoting *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (per curiam)). This is not an obvious case controlled by *Garner*. Accordingly, the "clearly established law must be 'particularized' to the facts of the case." *White*, 137 S. Ct. at 552 (quoting *Anderson*, 483 U.S. at 640). While it is not necessary for the Plaintiff to find an identical case, "existing precedent must have placed the statutory or constitutional question beyond debate." *Mullenix v. Luna,* 136 S. Ct. 305, 308 (2015). The state of the law at the time of the alleged violation must have provided the officer with fair warning that his conduct was unconstitutional. *Tolan*, 134 S. Ct. at 1866.

In an effort to show that the state of the law clearly established that the officers' conduct was unconstitutional, the Plaintiff cites *Crowley v. Rosie*, No. 13-442-

JHR, 2015 WL 5778603 (D. Me., Sept. 30, 2015).[15] In *Crowley*, a motion for summary judgment based on qualified immunity was denied where an officer had encountered a disturbed individual carrying a knife with an eight inch blade outside the police station. The officer, who called for backup and expected assistance to arrive quickly given his proximity to the station, situated himself with a cruiser between him and the individual. The officer drew his firearm and asked the individual what he was doing, and the individual repeated, "you better kill me." *Id.* at *3-4. Taking those statements as a threat, the officer stepped away from the cruiser and took a firing

---

[15]    The Plaintiff also cites cases from other jurisdictions where qualified immunity was denied in support of his contention that the law is clearly established. *Maldonado v. Fontanes*, 568 F.3d 263, 271 (1st Cir. 2009) (case law of other circuits may determine whether a right is clearly established).

In *Connor v. Thompson,* 647 F. App'x 231 (4th Cir. 2016) an officer who was called to transport a drunken, suicidal individual to the mental hospital met an man holding a paring knife at the top of the front steps where he was living. The officer ordered him to drop the knife, and he stumbled down the front steps still holding the knife. Although he made no aggressive move toward the officer, the officer fired his weapon twice and killed the man. The incident was over in minutes. In *Estate of Escobedo v. Bender*, 600 F.3d 770 (7th Cir. 2010), officers used an excessive amount of tear gas and flash bang grenades to extricate a non-resisting man who had committed no crime from his apartment when the individual had threatened to harm only himself. In *Mercado v. City of Orlando*, 407 F.3d 1152 (11th Cir. 2005), police shot a polyurethane baton, which was capable of lethal force if fired at close range, at a suicidal man who had committed no crime, did not pose a threat to the police, and had only been given 15 to 30 seconds to comply with the order to drop the knife that he held to his heart. In *Deorle v. Rutherford*, 272 F.3d 1272 (9th Cir. 2001) an officer, without waiting for the negotiation team or providing a warning, fired a lead-filled beanbag, which was considered lethal at close range, at an unarmed, suicidal individual who was walking toward the officer, had not attacked anyone, generally obeyed instructions given him by various police officers, and did not commit any serious offenses. In *Cyrus v. Town of Mukwonago*, 624 F.3d 856 (7th Cir. 2010), the police responded to a call that an individual—known by the police to be psychotic but not criminal—had wandered into a partially built new home wearing nothing but a bathrobe. The officer, who was familiar with the individual from previous delusional episodes, asked the individual to come speak with him. Instead, the individual told the officer that he lived at the property and asked the officer to leave. After this brief dialogue, the individual started back toward the house. The officer fired his Taser between six and twelve times, killing the man.

All of these cases are distinguishable. None involved an individual threatening the police or actively resisting arrest as Mr. Gerken had. With the exception of the *Escobedo* case, crisis negotiation teams had not been given a chance to resolve the situation. In *Escobedo*, negotiators were involved, but the communication between the negotiators and the site commander had broken down. The duration of the encounters in each of these cases were also considerably shorter, many occurring in just minutes.

position. The individual began to sprint toward the officer, and the officer fired multiple rounds. The record was silent on the officer's reasons for stepping outside the protection of the cruiser, the amount of time spent circling the cruiser, and the amount of time between the call for back-up and the shooting. On the record before him, Judge Rich was unable to determine whether the officer's action in stepping away from the cruiser "so contributed to the danger he faced that qualified immunity [was] unavailable." *Id*. at *9. The qualified immunity question was left open for evidentiary development at trial, but, because the case settled, the qualified immunity question was never decided.

For their part, the Defendants point to *Estate of Bennett v. Wainwright*, 548 F.3d 155, 175 (1st Cir. 2008)[16] and *Norton v. City of S. Portland,* 831 F. Supp. 2d 340, 363-64 (D. Me. 2011). In *Norton,* an emotionally disturbed man who had recently been released from a mental hospital barricaded himself and a friend in his home. The police received information from a co-worker that Norton wanted the police to shoot him and intended to come out of the house with knives. About four hours into the standoff, Norton allowed his friend to leave, alleviating the police's concern about a hostage, but Norton told the negotiators that he was going to come out with knives.

---

[16]     *Estate of Bennett* is factually distinguishable.  There, a mother called the police to report that her mentally ill son, who was off his medications, had threatened to kill her and had killed a dog with a bat. The mother reported that there were firearms in the home, but that her son did not know where they were. After evacuating family members from the house, the police returned to take the son into protective custody. While in the house, the police unsuccessfully attempted to communicate with the man, who was in a back room. The man came to the front of the house twice and encountered the police without incident. On his third foray, he appeared without warning and aimed a single-shot shotgun at the deputy sheriff who responded by telling the man to drop the gun. He fired, and two of the three officers responded with multiple shots, killing him. The First Circuit upheld summary judgment on qualified immunity grounds for the police officers.

The police, expecting Norton to emerge from the front of the house, were prepared with a beanbag shotgun. At 1:53 a.m., Norton emerged from the back door of his home with a large knife in his left hand and a smaller utility knife in his right hand. The three police officers nearest the back door raised their firearms and commanded Norton to drop the knives. The officer with the beanbag shotgun began moving to the rear of the house, but Norton started walking toward Officer Corbett, who was the closest officer. Norton held the knives with tips pointed up and out to the side, but he made no "throwing, thrusting or lunging" movement with either knife. *Id.* at 356. Officer Corbett took a step back, and at that moment, another officer, fearing for the safety of Officer Corbett, shot and killed Norton. Accident reconstruction revealed that at the time Norton was shot, he was between 15.28 and 19.37 feet from Officer Corbett.

Judge Singal found that the officer who shot Norton was entitled to qualified immunity. There was undisputed evidence that the police "are trained to use twenty-one feet as a guideline for when to use lethal force against a person armed with a knife." *Id.* at 363. Judge Singal reasoned:

> Officer Macisso's instinctive belief that Norton was too close to Corbett reflected not just his reasonable perception of the distance separating the two men but also all of the other information provided during the standoff and the conditions at the scene. Given this totality of circumstances, any reasonable officer on the scene would necessarily have perceived Michael Norton as acting expressly in accordance with his stated plan, which was to "get violent" and do whatever necessary to make officers use deadly force against him.

*Id.* at 363-64 (citing *Estate of Larsen v. Murr,* 511 F.3d 1255, 1261 (10th Cir. 2008) (affirming a grant of qualified immunity to an officer who used deadly force against

an agitated, suicidal man holding a large knife when the distance between the man and the officer was between seven and twenty feet)). *Norton,* decided in 2011, is the closest case to the present facts. It provided notice that it was reasonable to use deadly force against an agitated individual armed with a knife, who had issued a threat to police, and who was within twenty-one feet and advancing dangerously towards a fellow officer.

### ii.    Focused on the Particular Circumstances

It is the Plaintiff's burden at the second step to show that a reasonable officer in these circumstances would have known that the use of force violated clearly established law. *Belsito Communications, Inc. v. Decker*, 845 F.3d 13, 26-27 (1st Cir. 2016). Plaintiff mounts alternate theories to survive summary judgment. First, the Plaintiff contends that there is evidence in the record which would allow a jury to conclude that Mr. Gerken was running away at the time he was shot. Pl.'s Opp'n 27. Alternatively, Plaintiff concedes that Mr. Gerken may have been running in the direction of Det. Mitchell and Sgt. Grass, but argues that "it was likely Mr. Gerken was trying to run to the end of a blowdown and not run directly at Tactical Team members when he was shot." Pl.'s Opp'n 10.

Under the first theory, the Plaintiff attempts to

piece together what Shad Gerken likely experienced by using additional and sometimes contradictory statements made by the Tactical Team on the night of the shooting or in depositions; photographs taken by State Police personnel after the shooting; maps and diagrams created by State Police personnel; and forensic evidence including the autopsy of Shad Gerken.

31

Pl.'s Opp'n 23. The Plaintiff contends that "statements given by Det. Stetson, Sgt. Small, Cpl. Madore, Sgt. Dalton, and Sgt. Grass on the night of the shooting" all confirm that Mr. Gerken was running away when he was first shot. Pl.'s Opp'n 23-24. However, upon close examination of all of the eyewitness statements, most of the officers said that Mr. Gerken *initially* stood after being sprayed and started running away, *but* then Mr. Gerken turned to the right toward Det. Mitchell and Sgt. Shead. *See* SMF ¶¶ 209, 212, 389-90. Det. Stetson, Sgt. Shead, and Sgt. Small said that their view was obstructed by the spray from the fire hose, although Sgt. Shead said that when his view cleared Mr. Gerken was less than 20 feet away from Det. Mitchell. SMF ¶¶ 209, 212. Cpl. Madore stated only that Mr. Gerken stood with the knife and started running toward the back of the perimeter; he did not describe a turn to the right. *See* SMF ¶ 209. But Cpl. Madore was not advancing with the other officers. Cpl. Madore was approximately 40 feet away from Mr. Gerken, well back from the other officers. Forensic Map. Given his inferior vantage point, Cpl. Madore's failure to mention a turn to the right does not undercut the other consistent accounts that Mr. Gerken turned towards Det. Mitchell and Sgt. Shead's advance.

Similarly, the Plaintiff contends that a jury could conclude from the fact that most shots went from back to front that Mr. Gerken was running away at the time he was shot. This assertion disregards that the vast majority of shots hit Mr. Gerken after he fell to the ground. *See* SMF ¶ 417. Given Mr. Gerken's motions and the different positions of the shooting officers, I do not find that the ballistics are helpful to the Plaintiff.

In the alternative, the Plaintiff acknowledges that the blowdown of trees may have caused Mr. Gerken to turn right towards Det. Mitchell and Sgt. Shead. The Plaintiff contends that if Mr. Gerken turned right, it was only with the intent to get around the blowdown that was blocking his retreat into the woods. Pl.'s Opp'n 25. The Plaintiff asks me to consider the situation from Mr. Gerken's point of view, but I can "consider[] only the facts that were knowable to the defendant officers." *White*, 137 S. Ct. at 550. In this rapidly unfolding scenario, particularly in a thickly wooded area where the light was fading and the fire hose spray was partially obscuring the view, the officers reasonably could have concluded that Mr. Gerken, who was running in their direction, was on the attack, not trying to get away.

The Plaintiff further contends that Mr. Gerken was not threatening Det. Mitchell and Sgt. Shead with the knife. Pointing out that Mr. Gerken had one eye swollen shut, that the tactical team wore camouflage, and that the thick woods were dim, the Plaintiff claims that a reasonable jury could infer that "it was unlikely Mr. Gerken, as he was running, was able to spot Sgt. Shead and Det. Mitchell as they advanced toward him through the brush and, therefore, it was unlikely Mr. Gerken was running aggressively or menacingly toward Shead and Mitchell to attack them." Pl.'s Opp'n 25. This theory is highly speculative and lacks the evidentiary support needed to be considered a factual assertion.[17] Both Sgt. Shead and Det. Mitchell

---

[17] "[T]he summary judgment standard requires absolute deference to the nonmovant's factual assertions (as long as those assertions are put forward on personal knowledge or otherwise documented by materials of evidentiary quality . . ." *Morelli v. Webster*, 552 F.3d 12, 18-19 (1st Cir. 2009). But, "[t]he court's duty to view the facts in the light most favorable to the nonmovant does not require or permit the court to accept mere allegations that are not supported by factual evidence." *Chappell v. City of Cleveland*, 585 F.3d 901, 906 (6th Cir. 2009); *see also Scott v. Harris*, 550 U.S. 372, 378-80 (2007) (courts should not rely on the nonmovant's version where it is utterly discredited by the

33

described Mr. Gerken as raising his knife threateningly in the seconds before he was shot by Sgt. Shead. But even setting aside Det. Mitchell and Sgt. Shead's statements that Mr. Gerken held the knife menacingly, it is sufficient that he was running toward them with the knife.[18]

The Plaintiff does not dispute the Forensic Map, which concluded that at the time he was shot, Mr. Gerken was approximately 18.61 feet away from Det. Mitchell, 12.92 feet from Sgt. Grass, and 19.57 feet from Sgt. Shead. Nor is there a dispute that the police are trained to keep a distance of 21 feet or more from an individual armed with a knife. SMF ¶ 407.

Assessing the supportable facts in the light most favorable to the Plaintiff, Mr. Gerken was experiencing a mental health crisis and failed to drop the knife after being told repeatedly to do so over the course of almost seven hours. From the vantage of what the officers knew, Sgt. Shead was aware that Mr. Gerken had threatened to kill a child if she continued to look at him, that Sgt. Dunham had been cut trying to disarm Mr. Gerken, and that pepper spray and a Taser had been used by the first

---

record); *Berube v. Conley*, 506 F.3d 79, 85 (1st Cir. 2007) (where plaintiff offered nothing to challenge the veracity of the internally consistent police statements, there is no dispute of fact simply because plaintiff contends that there is no evidence that the officers were not lying.).

[18] The Plaintiff raises additional theories that are based on such improbable inferences that I reject as completely unsupported by the record. For instance, the Plaintiff argues that Mr. Gerken may have initially been lying in an alternate spot based on where the spent baton round was found. Pl.'s Opp'n 23. This theory, which would contradict the witnesses' testimony, assumes that the round travelled in a straight line, which is highly unlikely given that it passed through a densely wooded area. *See* SMF ¶ 404. Ultimately, the theory is immaterial. The Plaintiff fails to show why her alternative theory makes a difference in the analysis.

The Plaintiff also contends that since the forensic examiners found the knife six feet from Mr. Gerken's body, a jury could conclude that Mr. Gerken was unarmed when shot. Pl.'s Opp'n 27. This theory is completely undercut by the Plaintiff's admission that Mr. Gerken had the knife when he was shot. SMF ¶ 222.

responders without success. Sgt. Shead also knew that Mr. Gerken was fit and capable of quick movement. Minutes before the tactical plan was implemented, Mr. Gerken had waved the knife and said, "I will cut you." Once on his feet, Mr. Gerken initially ran away from the fire hose spray, but then turned to his right. The situation unfolded in just minutes, and because Sgt. Shead lost sight of Mr. Gerken in the fire hose spray, he had little time to react. When his view cleared, Sgt. Shead saw Mr. Gerken, still armed with the knife, running in the direction of Det. Mitchell's advance. Perceiving Mr. Gerken to be about 15 feet away and an imminent threat to both Det. Mitchell and himself, Sgt. Shead fired. At the time he fired, Mr. Gerken was about 19 feet from Shead and about 18 feet from Mitchell.

The Plaintiff contends that no reasonable officer could have perceived an imminent threat to himself or others under these circumstances. The Plaintiff repeatedly argues that Mr. Gerken did not pose a real threat because Mr. Gerken's threats were merely the products of his mental illness. While Mr. Gerken's mental health condition should and did inform the police response, the fact that he might not have been capable of understanding or complying with orders to drop the knife did not make him less dangerous. This case is a far cry from the cases cited by the Plaintiff, *see supra* n.16, involving suicidal individuals who did not pose a threat to the officers.

Viewing the facts in the light most favorable to the Plaintiff, in the totality of the circumstances, the Plaintiff is unable to establish that no reasonable officer would have used lethal force in the situation Sgt. Shead found himself.

### b. The Additional Rounds Fired

All three officers said that after Mr. Gerken had been shot by Sgt. Shead, they thought Mr. Gerken was attempting to get to his feet with the knife, and they all said that they felt he posed an imminent threat to officer safety.[19] Sgt. Grass fired 13 times, Det. Mitchell fired six times, and Sgt. Shead fired four or five additional rounds.

The Plaintiff argues that once shot by Sgt. Shead, Mr. Gerken did not pose an imminent threat.

> At this time, Mr. Gerken was presumably badly injured, and not likely to be as "fit and capable of quick, athletic movement" as he was perceived to be before. Cpl. Madore saw Mr. Gerken sit up and begin to "lunge forward" with the knife still in his hand. Sgt. Grass was 13 feet away, Sgt. Shead was 20 feet, and Det. Mitchell was 18 feet away from Mr. Gerken. All three Tactical Team members had their semi-automatic rifles trained on Mr. Gerken. Mr. Gerken did not present an imminent threat of bodily injury to any of these officers after he had been shot the first few times.

Pl.'s Opp'n 26-27 (internal citations omitted).

Skipping over whether the additional rounds were objectively reasonable, I focus on whether the right to be free from deadly force in these circumstances was clearly established, and whether Sgt. Grass, Det. Mitchell, and Sgt. Shead's actions were such that no reasonable officer in their position would have made the same

---

[19] The four eyewitness accounts differ slightly about what happened when Mr. Gerken fell after being first shot. Sgt. Grass, Det. Mitchell, and Sgt. Shead said that Mr. Gerken started to rise or get up with the knife in hand. Summ. of Interview with Sgt. Grass ¶ 25; Summ. of Interview with Det. Mitchell 5 (saying Mr. Gerken looked like he was going to get up); Summ. of Interview with Sgt. Shead ¶ 16. Cpl. Madore said that Mr. Gerken sat up and began to lunge forward with the knife. SMF ¶¶ 216, 224

choice. The question is whether any reasonable officer could have concluded that Mr. Gerken still posed an imminent threat after he was shot and had fallen.

### i.     Clearly Established Law

In *Berube v. Conley,* 506 F.3d 79 (1st Cir. 2007), the First Circuit addressed a claim that the police should have stopped shooting once the assailant was initially shot and on the ground. On a dark and rainy night, Berube, intent on suicide, decided to "raise a little hell" first. *Id.* at 81. He began smashing car windows with a hammer in the Lewiston Police Department parking lot. Officer Conley, the first on the scene, called for backup. When Berube saw her, he ran at her screaming with an object, later determined to be a hammer, in his hand. She started backing away and commanded him to drop his weapon. When he ignored her command she shot at him from a distance of six or seven feet. Berube fell to his knees and attempted to get back up, and Officer Conley continued firing "til the threat ceased." *Id.* at 83. Two other officers, who arrived as backup, saw Berube either kneeling or laying and observed a metallic object in his hand. Believing that Berube might have a firearm, and that the shots that they had heard might have been from Berube, they also began firing at Berube.

Addressing the additional shots fired once Berube was down, the First Circuit stated:

> It may well be true that Conley continued to fire as Berube fell to or lay on the ground. But it is clear from the very brief time that elapsed that she made a split-second judgment in responding to an imminent threat and fired a fusillade in an emergency situation. Conley's actions cannot be found unreasonable because she may have failed to perfectly calibrate the amount of force required to protect herself.

*Id.* at 85. "While one might regret Conley's failure to stop shooting as soon as Berube went down, immunity encompasses 'mistaken judgments.' " *Id.* (quoting *Malley v. Briggs*, 475 U.S. 335, 343 (1986)).

### ii. Focused on the Particular Circumstances

On the undisputed facts, Mr. Gerken had established himself as an unusually resilient individual. After pepper spray, Taser fire, an attempt by a game warden to wrest the knife from his grip, a blast from a fire hose, and being shot, Mr. Gerken still had hold of the knife. The light in the woods was dimming. Sgt. Grass was less than thirteen feet from Mr. Gerken. Despite orders to stop moving and stay down, the officers saw Mr. Gerken sitting up and making a lunging motion with the knife. The situation had been unfolding quickly, and now each officer was called on to make a split-second judgment. All three officers made the decision to shoot until Mr. Gerken was incapacitated. *See Norton*, 831 F. Supp. 2d at 363 (considering multiple officers decision that lethal force was warranted as a factor).

Under *Berube*, the law was established that an officer need not perfectly calibrate the amount of force required to protect himself in an emergency situation. On these facts, under this law, the Plaintiff has not shown that no reasonable officer, confronted with this situation, would have made the same choice that Sgt. Grass, Sgt. Shead, and Det. Mitchell each made. Accordingly, I find that the individual Defendants are entitled to qualified immunity on the excessive force claims under § 1983. Because the MCRA uses the same standard for qualified immunity for an excessive force claim as the federal standard, no independent analysis is required for the parallel state claim. *Smith v. Jackson*, 463 F. Supp. 2d 72, 81 (D. Me. 2006); *see*

*also Berube*, 506 F.3d at 85. The motion for summary judgment on Counts Two and Five is granted.

### C. Maine State Law Liability for Wrongful Death and Conscious Pain and Suffering

In Counts Six and Seven, the Plaintiff asserts a wrongful death claim and a conscious pain and suffering claim against the MSP and the individual defendants.[20] The individual defendants contend that they are entitled to immunity under the Maine Tort Claims Act ("**MTCA**"), which protects government employees from liability for conduct performed within "any discretionary function or duty, whether or not the discretion is abused." 14 M.R.S.A. § 8111(C); Defs.' Mot. for Summ. J. 34-35. The Plaintiff, in response, concedes that her wrongful death and pain and suffering counts are not independent causes of action, but rather theories of liability for damages dependent on an independent cause of action. Pl.'s Opp'n 35 (citing *McCue v. City of Bangor*, 1:14-cv-98-GZS, 2015 WL 6848539, at *12 n. 25 (D. Me. 2015)). Based on this concession, where the underlying claim is dismissed on qualified immunity grounds, the Plaintiff's wrongful death and conscious pain and suffering claims fail. Accordingly, the Defendants' motion for summary judgment on Counts Six and Seven is also granted.

---

[20]    Maine statute provides that government entities—such as the MSP—are immune from tort claims. 14 M.R.S.A. § 8103. The Plaintiff does not dispute the MSP's assertion that none of the four statutory exceptions to immunity in 14 M.R.S.A. § 8104-A apply. This settles the inquiry for the MSP.

## II.    Disability Discrimination

### A.    Discrimination in Effecting an Arrest

In Count Four, the Plaintiff asserts that the MSP is liable for disability discrimination under the Americans with Disabilities Act ("**ADA**"), 42 U.S.C. § 12101; the Rehabilitation Act, 29 U.S.C. § 794; and the Maine Human Rights Act, 5 M.R.S.A. § 4551. The MSP moves for dismissal of Count Four under the "exigency rule," which provides that the ADA is inapplicable in situations involving a threat to human safety until the individual is disarmed and in custody. Defs' Reply 9 (ECF No. 83). The MSP further contends that it did reasonably accommodate Mr. Gerken by calling in the crisis negotiation team and attempting to negotiate Mr. Gerken's surrender. Defs.' Mot. for Summ. J. 3; Defs.' Reply 9. The Plaintiff counters that the MSP should have done more to accommodate Mr. Gerken's disability, and the officers viewed "Mr. Gerken as a criminal, rather than as a person who was suffering from an acute, severe mental health crisis." Pl.'s Opp'n 28. The Plaintiff further contends that the exigency exception should not apply because Mr. Gerken never posed a genuine threat to human safety.

Title II of the ADA addresses discrimination by government entities and provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. To prevail on a Title II ADA claim, the plaintiff must show:

> (1) that he is a qualified individual with a disability; (2) that he was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities or was otherwise discriminated against; and (3) that such exclusion, denial of benefits, or discrimination was by reason of the plaintiff's disability.

*Buchanan v. Maine* 469 F.3d 158, 170-71 (1st Cir. 2006) (quoting *Parker v. Universidad de P.R.*, 225 F.3d 1, 5 (1st Cir. 2000)).[21] The applicable tests and available remedies under the Rehabilitation Act and Maine Human Rights Act are effectively the same as for Title II of the ADA. *Calero–Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6, 11 n.1 (1st Cir. 2004) ("The same standards . . . apply to claims under the ADA and under the Rehabilitation Act."); *Dudley v. Hannaford Bros. Co.*, 333 F.3d 299, 312 (1st Cir.2003) ("It is settled law that the MHRA should be construed and applied along the same contours as the ADA.").

At least two theories have emerged supporting disability discrimination claims arising out of arrests. *See Gohier v. Enright*, 186 F.3d 1216, 1220 (10th Cir. 1999). The first occurs where police misperceive the effects of an individual's disability as criminal activity and make an arrest based on their misperception. *Id.* (citing *Lewis v. Truitt*, 960 F. Supp. 175, 176-77 (S.D. Ind. 1997) (deaf individual mistaken for someone resisting arrest); *Jackson v. Town of Sanford*, No. 94-12-P-H, 1994 WL

---

[21]    The MSP concedes that Mr. Gerken was a qualified individual, and it concedes, solely for purposes of summary judgment, that the MSP is subject to the disability discrimination statutes. Defs.' Mot. for Summ. J. 22 n.13. The question of whether MSP is subject to the ADA is an open one. *See Tennessee v. Lane*, 541 U.S. 509 (2004) (Title II applies to states with regard to access to courts); *Buchanan v. Maine*, 469 F.3d 158, 173-74 (1st Cir. 2006) (citing *United States v. Georgia*, 546 U.S. 151 (2006) ("Congress unequivocally expressed its intent in the ADA to abrogate the States' sovereign immunity," but First Circuit did not reach the second-step question of the constitutionality of the abrogation because ADA claim failed on the merits); *Nieves-Márquez v. Puerto Rico*, 353 F.3d 108, 129 (1st Cir. 2003) (state waives Eleventh Amendment immunity under Rehabilitation Act if it accepts federal funding).

589617, at *1 (D. Me. 1994) (arrest of stroke victim for drunk driving)). To the extent that the Plaintiff is pursuing a theory that the police wrongfully perceived Mr. Gerken's conduct as criminal, that claim fails. This is not a case where the police misperceived the conduct of a disabled person as criminal. Mr. Gerken had threatened to kill an eight-year-old, and he refused to drop his knife, resulting in Sgt. Dunham's injury. The police correctly perceived Mr. Gerken's conduct as criminal, as did the judicial officer who signed the warrant for Mr. Gerken's arrest. *Gohier,* 186 F.3d at 1222, n.4. The wrongful arrest doctrine does not apply where police officers act on an accurate perception of the suspect's conduct as unlawful or posing a risk to the public. *See, e.g., Bates ex rel. Johns v. Chesterfield Cty.*, 216 F.3d 367, 373 (4th Cir. 2000) (autistic individual bit, scratched, and kicked police officers); *Buchanan v. Maine*, 417 F. Supp. 2d 45, 73 (D. Me. 2006) (schizophrenic individual stabbed a police officer); *Vincent v. Town of Scarborough*, No. 02-cv-239-PH, 2003 WL 22757940, at *24 (D. Me. 2003) (deaf and suicidal individual carried a rifle in a crowded shopping plaza). On the facts before me, the Plaintiff has not made out a claim for wrongful arrest based on a misperception of Mr. Gerken's disability.

The second theory supporting a disability discrimination claim occurs where police effectuate a lawful arrest based on criminal conduct *unrelated* to a person's disability, but they fail to accommodate the disability during the investigation or arrest process, resulting in the individual suffering greater injury than other arrestees. *Gohier.* 186 F.3d at 1222 (citing *Gorman v. Bartch,* 152 F.3d 907, 912-13 (8th Cir. 1998) (reversing dismissal of ADA suit alleging police had discriminated

against arrestee by transporting him to police station in vehicle unequipped to safely accommodate wheelchairs)).

There is a third situation that is "logically intermediate between the two archetypes envisioned by those theories," where the police effectuate a lawful arrest based on criminal conduct that is *related* to a person's disability. *Gohier,* 186 F.3d at 1221. In *Gohier,* a police officer encountered a mentally ill individual who was wielding a knife-like object. A tense encounter ensued during which the officer concluded that the individual was mentally ill. The individual aggressively approached and lunged at the officer, and the officer fatally shot him. The Tenth Circuit stated:

> Officer Enright did not use force on Mr. Lucero because he misconceived the lawful effects of his disability as criminal activity, inasmuch as Lucero's assaultive conduct was not lawful. Neither did Enright fail to accommodate Lucero's disability while arresting him for "some crime unrelated to his disability." Instead, Enright used force on Lucero while Lucero was committing an assault related to his disability.

*Id*. (quoting *Patrice v. Murphy*, 43 F. Supp. 2d 1156, 1159 (W.D. Wash. 1999)).

This case fits in this third category.

There is division within the Circuits over whether Title II of the ADA applies *at all* to encounters with violent, mentally ill individuals. The Fifth Circuit has held that:

> Title II does not apply to an officer's on-the-street responses to reported disturbances or other similar incidents, whether or not those calls involve subjects with mental disabilities, prior to the officer's securing the scene and ensuring that there is no threat to human life.

*Hainze v. Richards*, 207 F.3d 795, 801 (5th Cir. 2000). In contrast, the Fourth Circuit takes the view that exigent circumstances factor into whether the requested

modification is reasonable under the totality of the circumstances. *Waller ex rel. Estate of Hunt v. Danville*, 556 F.3d 171, 175 (4th Cir. 2009);[22] c*f. Bircoll v. Miami-Dade Cty.,* 480 F.3d 1072, 1085 (11th Cir. 2007) (holding exigent circumstances surrounding an arrest "go more to the reasonableness of the requested ADA modification than whether the ADA applies in the first instance," where a non-violent, deaf individual requested an accommodation); *Gohier*, 186 F.3d at 1221 ("[A] broad rule categorically excluding arrests from the scope of Title II . . . is not the law.").

As for controlling authority on the question, the Supreme Court has yet to decide the issue.[23] The First Circuit noted in 2006 that "[i]t is questionable whether the ADA was intended to impose any requirements on police entering a residence to take someone into protective or other custody beyond the reasonableness requirement of the Fourth Amendment." *Buchanan*, 469 F.3d at 176 n.13. Courts within this District have long referred to an "exigent circumstances exception" or have followed *Hainze. See, e.g., McKenny v. Mangino*, No. 2:15-cv-73, 2017 WL 1365959, at *6 (D.

---

[22]    *See also Seremeth v. Board of County Commissioners of Frederick County*, 673 F.3d 333 (4th Cir. 2012) (case-by-case approach to determine whether compliance with ADA is required in police interactions with presence of exigent circumstances considered in determination of reasonableness of accommodation). *Waller and Seremeth* seem to undercut dicta in *Rosen v. Montgomery Cty.*, 121 F.3d 154, 157 (4th Cir. 1997), expressing skepticism about "fitting an arrest into the ADA at all."

[23]    The Supreme Court had hoped to address the Circuit split by taking up the Ninth Circuit's decision in *Sheehan v. City and Cty. Of San Francisco*, 743 F.3d 1211, 1232 (9th Cir. 2014) which agreed with the Fourth and Eleventh Circuit's analysis. *City & Cty. of San Francisco v. Sheehan*, 135 S. Ct. 1765 (2015). But when the petitioners conceded that Title II of the ADA may "require[] law enforcement officers to provide accommodations to an armed, violent, and mentally ill suspect in the course of bringing the suspect into custody," the Supreme Court dismissed the portion of the petition for certiorari that raised the question of whether the ADA applied to arrests as improvidently granted. 135 S. Ct. at 1773 (quoting Pet. For Cert. i). The Supreme Court concluded that whether the ADA "applies to arrests is an important question that would benefit from briefing and an adversary presentation." *Id.* at 1773.

Me. Apr. 12, 2017) (no duty to accommodate until emergency faced by officers ended); *Norton,* 831 F. Supp. 2d at 361 (granting summary judgment where ADA claim would fall under the exigent circumstances exception); *Buchanan*, 417 F. Supp. 2d at 73 (recognizing applicability of ADA but granting summary judgment because duty to reasonably accommodate does not apply until exigent circumstances have dissipated); *Vincent*, 2003 WL 22757940, at *26 (applying *Hainze*); *Crocker v. Lewiston Police Dept.,* No. 00-cv-113-PC, 2001 WL 114977, *8 (D. Me. Feb. 9, 2001) (same).

Regardless of whether there is a per se rule that the ADA does not apply in exigent circumstances or whether exigency is one factor among many to determine whether a requested accommodation is reasonable, the threshold question is whether exigent circumstances existed. The Plaintiff argues that exigent circumstances did not exist leading up to the execution of the tactical plan and that the MSP's militaristic response unreasonably exacerbated Mr. Gerken's mental health crisis. The Plaintiff's experts opined that, under the totality of the circumstances, the collective law enforcement conduct[24] caused Mr. Gerken's condition to deteriorate and ultimately led to his death. Dr. Bourne stated:

> [Mr. Gerken's] psychotic beliefs and behavior were likely intensified by the increased agitation resulting from being cornered by the police, by repeated attempts to subdue him with Taser shots and with pepper spray, and by water shot from a fire hose. These multiple failed attempts had the paradoxical effect of rendering Mr. Gerken more agitated and more fixed in his delusion that he could not be harmed, and hence even less able to comply with police directives.

---

[24] I note that to the extent that the use of the Taser and pepper spray exacerbated Mr. Gerken's mental health crisis, those actions were taken by officers from other agencies before the MSP was even on the scene.

SMF ¶ 247. Baranowski stated that the tactical team's use of the fire hose caused Mr. Gerken to become confrontational. SMF ¶ 348. The Plaintiff suggests that the MSP could have, in the alternative, extended negotiations, used a net, tranquilizers, protective shields, the police K-9, or provided training in the proper use of a fire hose. Pl.'s Opp'n 31-32. The Plaintiff distinguishes the Maine cases in which the exigent circumstances exception to ADA compliance applied. Pl.'s Opp'n 31. The Defendants, relying on *Buchanan*, *Vincent*, and *Norton*, respond that exigent circumstances did exist, even before the execution of the tactical plan, because this was an armed standoff.

I agree with the Defendants that the MSP was faced with exigent circumstances and that they had a genuine concern for human safety. As the Fourth Circuit stated in *Waller*, "exigency is not confined to split-second circumstances. Although the officers did not face an immediate crisis, the situation was nonetheless unstable." *Waller*, 556 F.3d at 175. While the Plaintiff correctly distinguishes *Buchanan* (where a deputy was being stabbed) and *Vincent* (where the individual possessed a firearm in a crowded public area), he does not fairly distinguish *Norton*. Plaintiff states that, in contrast to *Norton*, Mr. Gerken was not holding a hostage. Pl.'s Opp'n 31. But at the time Norton emerged from his house wielding two knives, there was no concern about the safety of a hostage, who had already been released. In fact, the situation in *Norton* is similar to the situation presented here.

On the facts before me, taken in the light most favorable to the Plaintiff, no reasonable juror could conclude that the situation faced by the MSP did not involve

exigent circumstances and a threat to human safety. The MSP did not have the option of packing up and going home when it got dark. There is no dispute that Mr. Gerken was armed with a knife, that he was disturbed, that he had earlier told an 8-year-old to stop looking at him or he would kill her, that he had refused to drop the knife for the first responders, that he had resisted Sgt. Dunham's attempt to disarm him, and that he had withstood pepper spray and an attempt to Taser him. Except for the odd outburst, Mr. Gerken remained unresponsive, for over six hours of attempted negotiations, and he never once let go of the knife. It is undisputed that shortly before the tactical plan was executed, Mr. Gerken said, "I will cut you" as he waved his knife in the air. Although the Plaintiff points out that everybody was safe as long as Mr. Gerken lay on the ground, no one knew if and when Mr. Gerken would get up. To say that Mr. Gerken might still be there today if the police had not used the fire hose is speculative. On these facts, no reasonable juror could conclude that there was no exigency.

Many of the Plaintiff's accommodations were tried without success or rejected as unworkable. There is no dispute that negotiations extended over six hours. The Plaintiff offers no facts to suggest that lights were available that could have effectively lit the forest and allowed for further negotiations. Nor does the Plaintiff offer facts to rebut ██████████████████████████████████████████ ██████████████████████████████. The Plaintiff has not developed facts about whether nets and tranquilizers would have been effective under the circumstances or whether the materials to accomplish such a capture were available. One gets the distinct

impression that had these other tactics been unsuccessfully tried, the Plaintiff would be arguing that the MSP should have used a fire hose.

Even under the totality of the circumstances test set forth in *Waller*, the record indicates that the officers on the scene provided Mr. Gerken with reasonable accommodations.[25] The MSP conducted a lengthy, personalized negotiation by experienced officers. The officers shifted away from negotiations only when they perceived an increased risk to themselves and the public. As discussed above, Sgt. Grass's decision to use the fire hose as an alternative, non-lethal tool was objectively reasonable in these circumstances. Once Mr. Gerken rose to his feet and began to run, knife in hand toward Det. Mitchell's advance, exigent circumstances certainly curtailed any duty to accommodate Mr. Gerken's disability. *See Waller*, 556 F.3d at 175 ("Accommodations that might be expected when time is of no matter become unreasonable to expect when time is of the essence."). Accordingly, I find that the MSP is entitled to judgment as a matter of law on Count Four.

## B.    Discrimination as Failure to Train

Count Three asserts that the MSP violated the ADA through its failure to train officers to work with the mentally ill. The Plaintiff is not pursuing a failure to train claim against the MSP under § 1983, and is proceeding exclusively under the ADA

---

[25]    The MSP argues that even if the Court finds that officers failed to provide a reasonable accommodation, it can be held liable for the conduct of its employees only upon a showing of deliberate indifference. Defs.' Mot. for Summ. J. 29 (citing *Manuel v. City of Bangor*, No. 09-cv-339-BW, 2009 WL 3398489, at *3 (D. Me. Oct. 21, 2009) ("Discriminatory intent on the part of the governmental entity must be demonstrated in the form of deliberate indifference in order to recover money damages in a respondeat superior scenario."); *Sheehan*, 135 S. Ct. at 1774 (noting in dicta that police vicarious liability in ADA claims was "never decided"). Because I find that exigent circumstances existed and that in any event the MSP did reasonably accommodate Mr. Gerken, I do not reach this issue.

for her failure to train claim. Pl.'s Opp'n 10 n.2. A stand-alone failure to train claim under the ADA is not well established;[26] the First Circuit has assumed without deciding that Title II imposes a duty to "draft policies and train officers on the needs of the mentally ill public." *Buchanan*, 469 F.3d at 177. The *Buchanan* decision went on, however, to hold that where police training was provided, an argument that such training was insufficient "does not present a viable claim that [the individual] was 'denied the benefits of the services . . . of a public entity' by reason of his mental illness, as required under 42 U.S.C. § 12132." *Id.*; *cf. Thao v. City of St. Paul*, 481 F.3d 565, 568 (8th Cir. 2007) (without deciding if ADA imposes failure to train liability on a municipality, holding that plaintiffs failed to demonstrate more adequate training would have led to different police conduct); *Higgins v. Reed*, No. 11-cv-148, 2012 WL 3150813, at *2, *12 (D. Me. Aug. 12, 2012) (defendant officer was trained on ADA mental health compliance as part of basic training, precluding a failure to train claim under § 1983).

---

[26] The *Gohier* decision blended the failure to train issue into both the wrongful arrest and reasonable accommodation theories. The decision noted a passage of the ADA legislative history, which states:

> In order to comply with the non-discrimination mandate, it is often necessary to [train] public employees about disability. For example, persons who have epilepsy, and a variety of other disabilities, are frequently inappropriately arrested and jailed because police officers have not received proper training in [how to recognize and aid people having] seizures . . . . Such discriminatory treatment based on disability can be avoided by proper training.

*Gohier*, 186 F.3d at 1221 (alterations in original) (quoting H.R. Rep. No. 101-485, pt. III (1990)).

In light of *Buchanan*, this failure to train claim turns only on whether the MSP provided officers with training on the needs of the mentally ill pubic.[27] There is undisputed and ample evidence of training in mental illness for the officers involved in this confrontation, including the initial negotiator, the crisis negotiation team, and the tactical team.[28] I find summary judgment is warranted as a matter of law on Count Three.

## CONCLUSION

For the reasons stated above, the Court **GRANTS** the motion for summary judgment.


SO ORDERED.

/s/ Nancy Torresen
United States Chief District Judge

Dated this 18th day of August, 2017.

---

[27] The Plaintiff argues that training adequacy is a question of fact for the jury, and the actions of those trained constitute material evidence. Pl.'s Opp'n 33-34. *Buchanan* holds otherwise.

[28] Alternatively, the facts suggest that there would not have been a different outcome if the tactical team had received additional training. *Thao v. City of St. Paul*, 481 F.3d 565, 568 (8th Cir. 2007). The negotiation team, which has expertise in communicating with individuals with mental disabilities, did not object to Sgt. Grass's tactical plan, and Cpl. Madore told Sgt. Grass that further negotiation would not be successful. *See* SMF ¶¶ 99; 152.